681 F.2d 1039
 Stanley M. DIEFENTHAL and Elka F. Diefenthal, Plaintiffs-Appellants,
v.
CIVIL AERONAUTICS BOARD and Eastern Airlines, Inc.,
Defendants-Appellees.
Stanley M. DIEFENTHAL and Elka F. Diefenthal, Petitioners,
v.
CIVIL AERONAUTICS BOARD, Respondent.
 Nos. 80-3259, 80-3761.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 6, 1982.
 
 William G. Tabb, III, New Orleans, La., for plaintiffs-appellants and petitioners.
 Michaelle F. Pitard, Asst. U. S. Atty., New Orleans, La., Mark Frisbie, Glen M. Bendixsen, C. A. B., Washington, D. C., for C. A. B. in No. 80-3259.
 McGlinchey, Stafford & Mintz, William V. Dalferes, Jr., Dermot S. McGlinchey, Timothy F. Burr, New Orleans, La., for Eastern Airlines.
 Barbara Thorson, Mark Frisbie, Washington, D. C., for C. A. B. in No. 80-3761.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Petition for Review of an Order of The Civil Aeronautics Board.
 Before CLARK, Chief Judge, GEE and GARWOOD, Circuit Judges.
 CLARK, Chief Judge:
 
 
 1
 Stanley and Elka Diefenthal appeal from the district court's order dismissing their claims against the Civil Aeronautics Board (CAB) and Eastern Airlines. They also petition for review of a CAB order finding that regulating smoking was within the scope of its statutory authorization. We affirm.
 
 
 2
 * The Diefenthals purchased first class tickets aboard a flight from New Orleans to Philadelphia on Eastern Airlines. They requested seats in the smoking section and confirmed that their request was granted prior to departure. After they boarded the flight, the Diefenthals were told that the smoking section in first class was filled and that they would have to sit in a no-smoking area if they wished to fly first class. The Diefenthals alleged that in informing them that they could not smoke the flight attendant treated them "brusquely," causing them extreme embarrassment, humiliation and emotional distress.
 
 
 3
 This relatively trivial incident has given rise to a spate of litigation. The Diefenthals brought suit in district court to enjoin the CAB from enforcing its regulation requiring that no-smoking areas be provided on aircraft, see 14 C.F.R. § 252 (1981), on the ground that the CAB lacked statutory authority under the Federal Aviation Act (the Act), 49 U.S.C. §§ 1301-1551,[1] to regulate this area. The Diefenthals also sought an injunction to prevent Eastern from implementing section 252 on the ground that the regulation was invalid. Alternatively, if the regulation were valid, the Diefenthals alleged that Eastern's refusal to allow them to smoke contravened its own manual and sought an injunction requiring compliance with the manual. Finally, the Diefenthals alleged that Eastern had breached its contract with them by denying them first class seats in a smoking area and that it had tortiously embarrassed and humiliated them and deprived them of their right to smoke on board the plane. Eastern moved to dismiss the complaint for failure to state a claim on which relief could be granted.
 
 
 4
 After holding a hearing on Eastern's motion, the district court rejected the Diefenthals' request for injunctive relief against Eastern. It found that there was neither an express nor an implied private right of action under the Act. Alternatively, the court found that if there were a federal right of action, the Diefenthals were not entitled to injunctive relief since they had failed to allege any threat of irreparable injury.
 
 
 5
 The district court dismissed the Diefenthals' contract and tort claims for lack of diversity jurisdiction. With respect to the contract claim, the district court found that even though the parties were diverse, it could not "conceive by the wildest stretch of the imagination how there could be $10,000.00 damage on the basis of what (the Diefenthals) allege."
 
 
 6
 With respect to the tort claim, it was developed that the Diefenthals' claim was based solely on Eastern's duty to follow its manual. The Diefenthals argued that if Eastern had correctly followed the seating procedures outlined in its manual, they would have been able to smoke on board the flight. The district court dismissed this theory apparently on the ground that it turned implicitly on the existence of a private right of action. However, it allowed the Diefenthals to amend their complaint to allege that the actions of Easterns' employees had tortiously humiliated and embarrassed them. The court expressly cautioned the Diefenthals that the jurisdictional amount would again be in question. The court stated, "you ought to do something to satisfy me of that (the jurisdictional amount) from the very beginning, because its tough to conceive of the kind of damage you're talking about...."
 
 
 7
 The amended complaint alleged that an unknown flight attendant "maliciously, and intentionally treated plaintiffs in a manner calculated to cause plaintiffs serious embarrassment and humiliation." Eastern moved to dismiss the complaint for lack of subject matter jurisdiction. At a hearing on Eastern's motion to dismiss, the district court noted that the Diefenthals had not alleged any physical or emotional damage or loss of reputation. Although the Diefenthals never stated exactly what the flight attendant had said, the court found that it could not "conceive how being told, no matter how abruptly, that you cannot smoke before the few passengers that are in the first class cabin of an airplane can possibly, in the absence of some (physical or emotional) damage ... entitle (the Diefenthals) to $10,000.00."
 
 
 8
 With respect to the Diefenthals' claim that the CAB lacked authority to regulate smoking, the CAB moved to dismiss the claim for lack of jurisdiction. The CAB argued that section 1486 vests exclusive jurisdiction to review its orders and regulations in the courts of appeals. See 49 U.S.C. § 1486. Alternatively, it claimed that a party must seek review within 60 days after an order is issued, which the Diefenthals had failed to do. The CAB noted, however, that the Diefenthals could file a petition with it to eliminate its smoking regulation and then seek review of its order. The district court granted the CAB's motion and the Diefenthals then petitioned the CAB. They raised the same argument they had attempted to present to the district court, that in regulating smoking the CAB had exceeded its statutory authority.
 
 
 9
 The CAB considered the Diefenthals' request but reaffirmed its authority to regulate this area. The CAB noted that its regulation was based on two sections of the Federal Aviation Act: section 1374, which requires each carrier to provide "adequate service," and section 1324, which empowers the CAB to make such "rules and regulations ... as it shall deem necessary to carry out the provisions of ... this chapter."[2] It rejected the argument that the "adequate service" provision only concerned the number of flights a carrier provided and noted that this section had also been construed to govern the type of service provided. See Capital Airlines v. CAB, 281 F.2d 48 (D.C.Cir.1960). Moreover, the same phrase had been upheld as the statutory basis for regulating smoking on board interstate buses. See National Association of Motor Bus Owners v. United States, 370 F.Supp. 408 (D.D.C.1974) (three judge district court). Finally, the CAB noted that the regulation, which had been in effect since 1973, had been left intact by the Airline Deregulation Act of 1978. The Diefenthals petitioned for review of the CAB's order[3] and consolidated their petition with their appeal from the district court's order. We turn first to the petition for review.[4]
 
 II
 
 10
 The Diefenthals do not claim that the CAB's decision to regulate smoking was arbitrary or that the procedure employed by the CAB was flawed. Instead, they argue that Congress did not authorize the CAB to regulate the kind or quality of service which a carrier provides. The question to be answered is thus "not what the Board thinks it should do but what Congress has said it can do." CAB v. Delta Airlines, 367 U.S. 316, 322, 81 S.Ct. 1611, 1617, 6 L.Ed.2d 869 (1961). Because of the recent deregulation of the airline industry, two issues are presented. First, did the CAB have authority to regulate smoking under the Federal Aviation Act of 1958. Second, if it had the authority, did the Airline Deregulation Act of 1978 undercut that authority.
 
 
 11
 When a party challenges an agency's determination that a regulation is necessary to carry out the provisions of its enabling statute, the scope of our review is limited. In Mourning v. Family Publications Service, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), the Court stated:Where the empowering provision of a statute states simply that the agency may "make ... such rules and regulations as may be necessary to carry out the provisions of this Act," we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is "reasonably related to the purposes of the enabling legislation."
 
 
 12
 Id. at 369, 93 S.Ct. at 1660-61 (footnote and citations omitted). Even the absence of an express delegation of power to regulate a particular area is not fatal to the validity of a regulation so long as the regulation reasonably advances the purposes of the enabling statute. See American Trucking Associations v. United States, 344 U.S. 298, 309-12, 73 S.Ct. 307, 314-15, 97 L.Ed. 337 (1953). To have found otherwise would have defeated one of the reasons for which agencies were created. It was precisely because Congress could not be aware of the particular problems or needs that would develop in an area that it delegated authority to the agencies, within the broad confines of the statutory scheme, to deal with these problems as they arose. See id. at 309-10, 73 S.Ct. at 314.
 
 
 13
 In the case at bar, the CAB grounded its regulation in the language of the statute expressly requiring that each certified carrier provide "adequate service."[5] See 49 U.S.C. § 1374(a). On its face, this language supports the CAB's regulation. Because the division of the interior of an airplane into smoking and nonsmoking areas is one component of the service to be provided by a carrier, the regulation requiring it clearly appears to be reasonably related to the purposes of the Act.
 
 
 14
 The Diefenthals contend, however, that the language of the statute must be read in the context of the purposes of the Act. They argue that in enacting the Federal Aviation Act, Congress intended to commit only economic regulation to the CAB and left the details of passenger service and comfort to the managerial discretion of each airline. In support of their argument, the Diefenthals claim that the CAB has interpreted the adequate service provision to refer only to the number of flights provided by a carrier. Finally, the Diefenthals argue that other sections of the Act, particularly section 1371(e) (4), preclude the CAB from regulating the quality of service provided. We disagree.
 
 
 15
 The validity of the Diefenthals' argument turns initially on whether the phrase "adequate service" refers only to the number of flights a carrier provides or includes the type or quality of service as well. The phrase, however, is not defined by the statute, see 49 U.S.C. § 1301, nor is there any reference in the legislative history of the Act to its specific meaning. The Diefenthals rely on the CAB's interpretation of this phrase to establish that it refers only to the number of flights a carrier provides. While the Diefenthals are correct in stating that the CAB has found that the number of flights scheduled is a component of adequate service, that interpretation does not preclude the phrase from also referring to the quality of service provided. Indeed, even if the CAB had previously stated that this phrase referred exclusively to the number of flights scheduled, the CAB is not prevented from reconsidering its interpretation and reaching a contrary conclusion. See American Trucking Associations v. United States, 344 U.S. at 314, 73 S.Ct. at 316; National Petroleum Refiners Association v. FTC, 482 F.2d 672, 693-94 (D.C.Cir.1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974). In the case at bar, however, the CAB has consistently treated the quality of service as a component of "adequate service" since 1973.
 
 
 16
 Other references to "service" in the Act indicate that Congress intended the term to refer to both quantity and the kind of service offered. Section 1371(e) provides that each certificate granted shall specify the service to be rendered and later refers to the "type of service provided therein." See 49 U.S.C. §§ 1371(e)(1) and (e)(6). In construing the same language in an analogous section of the Motor Carrier Act,[6] Judge Learned Hand recognized that this provision allowed the Interstate Commerce Commission (ICC) to specify the "quality of service" which was to be provided. See Crescent Express Lines v. United States, 49 F.Supp. 92, 94-95 (S.D.N.Y.) (three judge district court), aff'd, 320 U.S. 401, 64 S.Ct. 167, 88 L.Ed. 127 (1943). Thus, the district court in that case found that a carrier could not change the type of sedan passenger service which it had been authorized to perform. In upholding the district court, the Supreme Court stated that the ability to specify the service to be rendered necessarily included the power to specify the general type of vehicle to be used. See Crescent Express Lines v. United States, 320 U.S. at 408, 64 S.Ct. at 171. These opinions make clear that the "service" which a carrier is required to provide is not limited to the number of flights scheduled.
 
 
 17
 The Diefenthals argue, however, that the legislative history of the Act compels a different result. They contend that Congress disclosed an intention to limit the CAB's regulatory authority to matters which affect the economic stability of the industry, leaving the quality of service to the managerial discretion of each airline. While we agree that economic stability was a major purpose of the Act, it was not the Act's exclusive purpose.[7]
 
 
 18
 Prior to the Act's passage in 1938, the airline industry was in a state of flux.[8] Initially, airlines had depended on contracts to carry the mail as their primary source of revenue. The competition for these contracts, which had been fierce, led to disastrously low bids by the airlines and unstable economic conditions throughout the industry. See H.Rep.No.2254, 75th Cong., 3d Sess. 2 (1938). This instability was heightened when the Postmaster General abruptly cancelled all mail contracts because of the discovery of fraudulent practices in their procurement. Also contributing to the change in the industry was the fact that passenger service, which had initially provided only a minor portion of the revenues, began to play an increasingly greater role.
 
 
 19
 In 1934, Congress enacted the Air Mail Act to provide temporary relief for the airlines' economic problems. It recognized, however, that the industry was rapidly expanding and that to ensure its growth, more comprehensive measures were needed. It therefore established the Federal Aviation Commission to study the entire industry and to provide Congress with "recommendations of a broad policy covering all phases of aviation and the relation of the United States thereto." See S.Doc.No.15, 75th Cong., 1st Sess. 1 (1935).
 
 
 20
 The resulting study represented one of the first attempts to formulate a comprehensive federal policy for the airline industry. Not only did it recommend economic regulation along the lines of that adopted in the motor carrier industry but it also sought to centralize into one new agency the safety and other regulatory functions which were then scattered among several federal agencies. See id. at 7-39 (summarizing the Commission's recommendations). In providing for the economic regulation of the industry, the Commission envisioned that the new agency's role in specifying the service to be rendered by a carrier would go beyond merely specifying the minimum number of flights. The Commission recommended that:
 
 
 21
 (c)ertificates of convenience and necessity should be issued under proper safeguards and specifications. Provision should be made to specify a minimum quality of service and a minimum frequency of schedule on airlines.
 
 
 22
 The Commission recognized, however, that competition had been an important factor in achieving the quality of service that American airlines then provided. See id. at 61-62. It chose not to recommend a national monopoly airline since it believed that competition would spur the industry to provide better service in the future. See id. The Commission thus appears to have envisioned that the new agency would specify the minimum quality of service and that competition would motivate the airlines to go beyond that minimum. The Commission noted the difficulty of striking the proper balance between competition and regulation in the absence of practical experience. See id. at 62. It suggested that Congress articulate these divergent goals and entrust their application to the new agency. See id.
 
 
 23
 Congress appears to have adopted the Commission's suggestions almost verbatim. It provided that in exercising its duties the CAB should consider both "(t)he promotion of adequate ... service" and "(c)ompetition to the extent necessary to assure the sound development of an air-transportation system...." 49 U.S.C. §§ 1302(c) and (d). Thus, even though Congress charged the CAB to consider competition, it is clear from the legislative history that it entrusted the CAB to specify the minimum quality of service necessary to balance the need for regulation against the benefit of competition.[9]
 
 
 24
 The Diefenthals finally argue that section 1371(e)(4) is a statutory bar to the regulation of smoking. This section provides that the certificate issued by the Board may not "restrict the right of an air carrier to add to or change schedules, equipment, accommodations, and facilities for performing the authorized transportation and service as the development of the business ... shall require...." 49 U.S.C. § 1371(e)(4). The Diefenthals rely on Continental Air Lines v. CAB, 522 F.2d 107, 115 (D.C.Cir.1974), for the proposition that this section was intended to preserve management discretion over the kind and quality of service offered. The difficulty with this argument, however, is that Continental also recognized that "no one section is an absolute restriction on actions the Board may take to further other statutory goals." Id. at 116. Thus, Continental did not treat section 1371(e)(4) as a statutory restriction on the Board's power to regulate but instead considered it as an aid in determining whether any regulation enacted was arbitrary or capricious. See id. at 116-17. While Continental indicates that the CAB may act arbitrarily by ignoring the effect of competition on the service required to be provided, it does not support the Diefenthals' argument that the CAB lacked the statutory authority to promulgate the regulation in the first instance.
 
 
 25
 This interpretation of section 1371(e)(4) is consistent with the Supreme Court's interpretation of an analogous section of the Motor Carrier Act.[10] See Crescent Express Lines v. United States, 320 U.S. 401, 407-09, 64 S.Ct. 167, 170-71, 88 L.Ed. 127. In Crescent, the Court noted that this section was added to the Motor Carrier Act to allay fears that certification would thwart the natural growth of regulated businesses. See id. at 407 n.6, 64 S.Ct. at 170 n.6 (quoting Senator Wheeler's explanation of this section). The concern was that once a carrier was certified it would have to reapply to the ICC every time it sought to expand or change the details of its business. See id. The Court thus found that this section did not prevent the ICC from specifying the kind of service that was to be provided. It merely allowed a carrier to add to the service already certified. See id. at 407-08, 64 S.Ct. 170-71.
 
 
 26
 The Supreme Court's analysis indicates that, contrary to the Diefenthals' argument, section 1371(e)(4) was not intended to lay out areas of agency responsibility. Clearly, it does not prohibit CAB's regulation of the quality of service provided. Rather, the section does no more than recognize that an airline need not submit for agency approval every addition to or change in its service, consistent with that already certified, to the CAB for approval. Although the Act contains other provisions which recognize the importance of competition, see 49 U.S.C. § 1302, this is not one of them and does not bar the regulation issued here.
 
 
 27
 Although we conclude that the CAB clearly had the power under the Federal Aviation Act of 1958 to require carriers to provide nonsmoking areas, this conclusion does not end our inquiry. We must still determine whether the Airline Deregulation Act of 1978 was intended to deny the CAB the authority to regulate the minimum quality of service to be provided.
 
 
 28
 The Airline Deregulation Act eliminated many of the requirements that had previously been placed on carriers and thus limited the CAB's authority to regulate with respect to those requirements. See § 1601(a)(2) (codified at 49 U.S.C. § 1551(a)(2)). Although Congress deleted almost all of section 1374, it specifically retained that portion of the section which requires air carriers to provide safe and adequate service. See § 1601(a)(2)(B). The fact that Congress retained this one provision suggests that it intended to preserve both this requirement and the CAB's power to regulate this area.
 
 
 29
 This interpretation is consistent with the legislative history. In considering the need for deregulation, Congress was specific in pointing out the failings of the regulatory system. It noted that the CAB had consistently denied applications for new routes, refused to allow new carriers to enter the trunkline industry and discouraged the use of experimental discount fares. See H.Rep.No.1211, 95th Cong., 2d Sess. 2, reprinted in 1978 U.S.Code Cong. & Ad.News 3737, 3738. It also criticized the certification procedure developed by the CAB as time consuming and expensive. See id. Congress did not, however, criticize the CAB's regulation of the quality of service provided or, specifically, its well-known regulation of smoking. Thus, neither the language of the Act, as amended, nor the legislative history suggests any intent to deny the CAB's power to regulate adequate service.
 
 
 30
 The Diefenthals argue, however, that the public interest factors which Congress directed the CAB to consider in promulgating regulations show that the CAB lacks the power to regulate the quality of service. They note that the CAB should consider the "encouragement, development and maintenance of an air transportation system relying on actual and potential competition ... to determine the variety, quality and price of air transportation services." See § 3(a) (amending 49 U.S.C. § 1302). The Airline Deregulation Act, however, also requires the CAB to consider the "development and maintenance of a sound regulatory environment" and the "availability of a variety of adequate, economic, efficient and low-price services by air carriers." Id. These factors do not indicate that Congress intended to deny the CAB authority to regulate the quality of service provided. Congress struck a new balance between competition and regulation; it intended for the CAB to rely whenever possible on the marketplace to determine the quality of service that would be provided. The fact that Congress struck a new balance does not suggest that it intended to prevent the CAB from regulating the quality of service, only that it intended for the CAB to evaluate the need for regulation in a new light. The issue of whether the CAB has chosen wisely in light of this new balance is not before us. The Diefenthals have challenged the CAB's power to regulate, not its choice.
 
 III
 
 31
 The district court dismissed the Diefenthals' claims for injunctive relief against Eastern on the ground that they did not have an implied private right of action under the Federal Aviation Act. The Diefenthals argue that they established an implied right of action by showing that they met the factors noted in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). We disagree.
 
 
 32
 In Cort v. Ash, the Supreme Court rejected the common law presumption that the mere violation of a statute entitled the injured party to redress his grievances through a private suit in federal court. Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 25, 101 S.Ct. 2615, 2629, 69 L.Ed.2d 435 (1981) (Stevens, J., concurring in part and dissenting in part); Touche Ross & Co. v. Redington, 422 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). Instead of presuming an implied cause of action from the fact of a violation, the Court recognized that the necessary inquiry was whether Congress intended to allow private litigants to enforce the statute or to seek damages for its breach. See Touche Ross & Co. v. Redington, 422 U.S. at 568, 99 S.Ct. at 2479.
 
 
 33
 Congress of course can make its intent clear by expressly providing a cause of action. However, even if it fails to provide an express private right of action, the Court has identified certain factors which indicate Congress' intent to provide an implied private right of action:
 
 
 34
 First, is the plaintiff "one of the class for whose especial benefit the statute was enacted,"-that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
 
 
 35
 Cort v. Ash, 422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted). Although these four factors remain the benchmark for determining the intent of Congress, their aid in revealing that intent varies with each statute to which they are applied. See Touche Ross & Co. v. Redington, 422 U.S. at 575-76, 99 S.Ct. at 2489.
 
 
 36
 We need not consider whether a private right of action exists with respect to the Diefenthals' first claim for injunctive relief. The Diefenthals contend that they are entitled to enjoin Eastern from implementing section 252 on the ground that the CAB's lack of authority to regulate smoking rendered the regulation invalid.[11] We have, however, already considered this argument and rejected it.
 
 
 37
 Alternatively, the Diefenthals claim that even if the regulation is valid Eastern has failed to comply with its own manual. They thus seek an injunction requiring compliance in the future. Although the Diefenthals do not specify what particular provision of the statute they are seeking to enforce, there appear to be two possible provisions, sections 1374(a) and 1374(b).
 
 
 38
 Eastern's manual was adopted pursuant to 14 C.F.R. § 252.3, which in turn was adopted pursuant to section 1374(a). The Diefenthals' argument appears to be that section 1374(a) and section 252 require each carrier to comply with the manual promulgated thereunder. Because Congress did not provide an express right of action to enforce either section 1374(a) or section 252, we must determine whether Congress intended to imply a private right of action. See Cort v. Ash, supra.
 
 
 39
 The first factor noted in Cort was whether the plaintiffs were members of a class for whose especial benefit the statute was created. Section 1374(a), however, does not provide protection for any particular class of persons. It requires as a general matter that the airlines maintain a certain level of service. The Court has recognized that phrasing a statute in general terms rather than specifically identifying the benefitted class indicates a lack of intent to create a private right of action. See California v. Sierra Club, 451 U.S. 287, 293, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981); Cannon v. University of Chicago, 441 U.S. 677, 690-93, 99 S.Ct. 1946, 1954-55, 60 L.Ed.2d 560 (1979).
 
 
 40
 The Diefenthals argue, however, that in implementing Congress' policies, the CAB identified smokers as a class whom Congress intended to benefit. They note that section 252 expressly refers to smokers and provides for the creation of both smoking and nonsmoking areas. Even if we assume that the CAB's actions are indicative of Congress' intent, the Diefenthals' argument lacks merit. Section 252 only requires carriers to protect the interests of non-smoking passengers. See 14 C.F.R. §§ 252.2-252.3 (1981). The regulation expressly provides that "(n)othing in this regulation shall be deemed to require such carriers to permit the smoking of tobacco aboard aircraft." 14 U.S.C. § 252.1 (1981). The regulation thus makes clear that it was enacted to control smokers, not to benefit them.
 
 
 41
 With respect to the second factor noted in Cort, there is evidence of legislative intent to deny a private right of action under section 1374(a). In section 1007 of the Act, Congress provided an explicit enforcement scheme. See 49 U.S.C. § 1487. Section 1487 authorizes the Board to seek injunctive relief to enforce any provision of the Act. It further authorizes the Attorney General to seek an injunction for the violation of section 1514 and expressly grants a private right of action to "any party in interest" to seek an injunction for a violation of section 1371(a). When Congress has established a detailed enforcement scheme, which expressly provides a private right of action for violations of specific provisions, that is a strong indication that Congress did not intend to provide private litigants with a means of redressing violations of other sections of the Act. See Middlesex County Sewerage Authority v. National Sea Clammers, 453 U.S. 1, 13, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981).
 
 
 42
 The Diefenthals' support this point only by citing cases which have found an implied private right of action to enforce the antidiscrimination provision of section 1374(b). These cases are unpersuasive for two reasons. First, the existence of a private right of action under section 1374(b) does not necessarily indicate that Congress meant to provide a private right of action under section 1374(a). Second, the cases which the Diefenthals cite were all decided prior to Cort v. Ash. Rather than seeking to determine Congress' intent, these cases relied on the common law presumption that an injured party was presumed to have a right of action.[12] See Merrill Lynch, Pierce, Fenner & Smith v. Curran, --- U.S. ----, ----, 102 S.Ct. 1825, 1837, 72 L.Ed.2d 182 (1982); id. at ----, 102 S.Ct. at 1849 (Powell, J., dissenting). As such, their holdings are not indicative of the inquiry into Congress' intent which Cort v. Ash requires that we make.
 
 
 43
 With respect to the third factor noted by Cort, granting a private right of action to seek compliance with the Act would not advance the legislative goal of providing adequate service. The CAB already possesses the power to require compliance with the Act and has developed an extensive enforcement division. See 49 U.S.C. § 1487; Diederich, Protection of Consumer Interests Under the Federal Aviation Act, 40 J. Air L. & Com. 1, 15-26 (1974) (describing CAB enforcement procedures). The CAB's power to seek injunctive relief is thus more than adequate to cure egregious instances of noncompliance, such as a carrier's refusal or consistent failure to comply with a regulation.
 
 
 44
 The only instances in which a private right of action might supplement rather than duplicate the CAB's efforts would be those cases where the violation was too infrequent or too sporadic for the CAB to act. However, in such cases injunctive relief is unnecessary. Cf. Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944).
 
 
 45
 The final factor noted by Cort was whether the issue were one normally committed to state law. Although the duty to provide adequate service does derive solely from federal law, this factor by itself is insufficient to counter the strong indication provided by the first three factors that Congress did not intend to create a private right of action to enforce section 1374(a).
 
 
 46
 Alternatively, the Diefenthals argue that a private right of action exists under section 1374(b), which prohibits an air carrier from subjecting "any particular person ... to any unjust discrimination ... in any respect whatsoever." See 49 U.S.C. § 1374(b). The Diefenthals claim that they were discriminated against by Eastern with respect to other smokers. Other passengers on board the Eastern flight were allowed to smoke while the Diefenthals were denied the right to do so, allegedly in violation of Eastern's manual.
 
 
 47
 This circuit has implicitly recognized a private right of action under section 1374(b). See Smith v. Piedmont Aviation, 567 F.2d 290 (5th Cir. 1978) (upholding an award of damages under § 1374(b) without discussing the existence of a private right of action). However, even if an implied right of action exists under section 1374(b), denying the Diefenthals the right to smoke did not constitute discrimination within the meaning of this section.
 
 
 48
 Section 1374(b) has been recognized to prohibit the granting of preferential and discriminatory rates, the denial of access to flights and terminals on the basis of race and the practice of "bumping" passengers in violation of established policies. See Mason v. Belieu, 543 F.2d 215, 219 (D.C.Cir.), cert. denied, 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976); Polansky v. Trans World Airlines, 523 F.2d 332, 335-36 (3d Cir. 1975). In Polansky, the Third Circuit recognized, however, that every difference in treatment by an airline does not constitute discrimination.[13] It found that section 1374(b) was only intended
 
 
 49
 to protect the right of access to air facilities from discriminatory interference by the air carrier.... (I)t is this denial of access to air facilities, whether caused directly, by outright refusal of permission to board, or indirectly, by burdening the potential user with special requirements not applied to the general public, which is critical.
 
 
 50
 523 F.2d at 335-36 (emphasis in original). Thus, Polansky found that the provision of first-class hotel accommodations which were inferior to the tourist-class accommodations provided by an airline tour was simply not the kind of discrimination that the Act was designed to prohibit. We agree with the Third Circuit's reasoning.
 
 
 51
 In the case at bar, the Diefenthals were not denied access to Eastern's flight from New Orleans to Philadelphia. They were simply unable to smoke while seated in the first class section of the flight. Were we to recognize the Diefenthals' claim that Eastern's alleged failure to comply with its manual constituted discrimination, every failure to treat each passenger similarly could become a violation of the Act. For example, an airline's manual might require that it stock a certain number of cans of a brand of soft drink on each flight. If an airline inadvertently failed to stock enough of brand A and forced an unwilling passenger to drink brand B, the aggrieved passenger would, under the Diefenthals' theory, be able to sue because he was discriminated against with respect to all other brand A drinking passengers. This is simply not the kind of discrimination Congress intended to prevent.
 
 IV
 
 52
 The district court dismissed the Diefenthals' contract and tort claims against Eastern for lack of diversity jurisdiction. Even though the parties were diverse, the court found that it could not conceive how the inquiries alleged satisfied the requisite $10,000 limitation. See 28 U.S.C. § 1332. The Diefenthals argue that because their request for $50,000 in damages was made in good faith the district court had jurisdiction. We disagree.
 
 
 53
 Before considering the merits of the Diefenthals' argument, it is important to review the allegations made in their complaint. The plaintiffs initially alleged only that the stewardess had "brusquely" informed them that there were no vacant seats in the first-class smoking section. Because of her manner, they claimed that they were "damaged, embarrassed, humiliated and were deprived of their right to smoke during said flight." During the first hearing on Eastern's motion to dismiss, the district court judge told the Diefenthals' counsel that he doubted highly that the damages alleged amounted to $10,000. When the judge allowed the Diefenthals to amend their complaint, he expressly advised their counsel that "you ought to do something to satisfy me of (the jurisdictional amount) from the very beginning, because its tough to conceive of the kind of damage you're talking about...."
 
 
 54
 The amended complaint alleged only that a flight attendant "maliciously and intentionally treated plaintiffs in a manner calculated to cause plaintiffs serious embarrassment and humiliation." No physical contact was asserted. The complaint did not allege that any physical or emotional impairment or loss of reputation resulted from the stewardess' actions, nor did it seek punitive damages. It simply alleged that the stewardess' remarks were brusque and intentional and that they had resulted in $50,000 worth of humiliation. When Eastern moved to dismiss for lack of jurisdiction, the Diefenthals did not attempt to support their complaint with affidavits which might have revealed some factual basis of their claim for damages. They simply rested on the unsupported allegation that the stewardess' actions humiliated them.
 
 
 55
 In St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938) (footnotes omitted), the Court stated:
 
 
 56
 The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really far less than the jurisdictional amount to justify dismissal.
 
 
 57
 The Court, however, also noted that the party invoking the court's jurisdiction bears the burden of "alleg(ing) with sufficient particularity the facts creating jurisdiction" and of "support(ing) the allegation" if challenged. See id. at 287 n.10, 58 S.Ct. at 590 n.10 (citing McNutt v. General Motors Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)); see generally Wright & Miller, Federal Practice and Procedure § 3702. In order to meet this burden, a party may amend the pleadings, as was done in this case, or may submit affidavits. See Wright and Miller at § 3702. This procedure provides a court with a basis for making a threshold determination as to whether the jurisdictional amount has been satisfied.
 
 
 58
 In establishing the jurisdictional amount, Congress intended to set a figure "not so high as to convert the Federal Courts into courts of big business nor so low as to fritter away their time in the trial of petty controversies." Sen.Rep.No. 1830, 85th Cong., 2d Sess., reprinted in 1958 U.S.Code Cong. & Ad.News 3099, 3101 (explaining the $10,000 threshold figure). While a federal court must of course give due credit to the good faith claims of the plaintiff, a court would be remiss in its obligations if it accepted every claim of damages at face value, no matter how trivial the underlying injury. This is especially so when, after jurisdiction has been challenged, a party has failed to specify the factual basis of his claims. Jurisdiction is not conferred by the stroke of a lawyer's pen. When challenged, it must be adequately founded in fact.
 
 
 59
 In the case at bar, the only specific factual incident alleged was that the stewardess had brusquely told the Diefenthals that there were no vacant seats left in the first-class smoking section. The amended complaint merely alleged that the stewardess had intended to humiliate the plaintiffs. It failed to demonstrate how the Diefenthals had suffered anything more than a trivial loss. Even though the Diefenthals were aware that both the court and Eastern questioned the factual basis of their damage claim, they wholly failed to specify that basis.[14]
 
 
 60
 To a legal certainty, the brusque refusal by a stewardess to permit a passenger to sit in a particular smoking section, even a refusal the requesting passenger asserts was intended to "humiliate," will not justify a damage claim of $10,000.[15] This aspect of the suit is precisely the kind of "petty controversy" that Congress intended the jurisdictional amount to exclude from federal jurisdiction.[16]
 
 
 61
 In sum, the party invoking the court's jurisdiction has the burden of establishing the factual basis of his claim by pleading or affidavit. This allows the court to test its jurisdiction without requiring the expense and burden of a full trial on the merits. The Diefenthals were put on notice both by the court's own statements and by Eastern's motion to dismiss for lack of jurisdiction, that they needed to show some basis for the amount of damages they claimed. They failed to do so and the district court properly dismissed their claims.
 
 
 62
 AFFIRMED.
 
 
 
 [1]
 The Federal Aviation Act of 1958, pursuant to which the CAB initially promulgated section 252, was substantially amended by the Airline Deregulation Act of 1978, Pub.L.No. 95-504, 92 Stat. 1705
 
 
 [2]
 The regulation specifies that it was promulgated under three sections of the Act; section 1324, section 1374 and section 1377. See 14 C.F.R. § 252. Section 1377 merely empowers the CAB to require the carriers to keep and submit records. It is not relevant to the Diefenthals' challenge
 
 
 [3]
 The Diefenthals petition us to review Order No. 80-8-80. After this order was issued, the CAB decided to reconsider its authority to regulate smoking. After notice and comment, it issued Regulation ER-1245, which addresses both the CAB's statutory authority and the need for the regulation. ER-1245 reaffirms the decision reached in Order No. 80-8-80. At oral argument before this panel, counsel for the CAB conceded that ER-1245 did not assert any different rationale for the CAB's authority to regulate smoking
 
 
 [4]
 Although the Diefenthals also appealed from the district court's order dismissing their claim against the CAB, we do not reach the issue of whether the district court had jurisdiction to review the CAB's regulation. Because the petition for review presents the same arguments that the Diefenthals attempted to raise before the district court, our review of their petition obviates the need to consider their appeal
 The Diefenthals also argue that the CAB's order violates the antidiscrimination provisions of section 1374(b). Because Order No. 80-8-80 indicates that they did not raise this issue before the CAB, they are precluded from raising it here. See 49 U.S.C. § 1486(e).
 
 
 [5]
 The CAB also relied on the requirement that each carrier establish "just and reasonable practices." See 49 U.S.C. § 1374(a). In its order reaffirming its authority, the CAB, however, stressed its reliance on "adequate service." Because we find that the "adequate service" provision is sufficient by itself to support the regulation, we do not consider whether "just and reasonable practices" would also suffice
 
 
 [6]
 49 U.S.C. § 308 (amended version codified at 49 U.S.C. § 10922). We have previously recognized that the regulatory section of the Federal Aviation Act was modeled on the Interstate Commerce Act. We have thus looked to the latter as a guide in interpreting Congress' intent in the Federal Aviation Act. See Transcontinental Bus System v. CAB, 383 F.2d 466, 480 (5th Cir. 1967)
 
 
 [7]
 Section 252 was promulgated pursuant to section 1374(a) of the Federal Aviation Act of 1958. Because this section was a "reenactment without substantive change" of the same section in the Civil Aeronautics Act of 1938, see H.Rep.No.2360, 85th Cong., 2d Sess. 15 (1958), the legislative history of the 1938 Act provides the primary guide to its meaning
 
 
 [8]
 The following brief summary of the events preceding the passage of the Federal Aviation Act is drawn primarily from Note, Federal Regulation of Aviation, 60 Harv.L.Rev. 1235 (1947). See also Westwood & Bennett, A Footnote to the Legislative History of the Civil Aeronautics Act of 1938, 42 Notre Dame Law. 309 (1967)
 
 
 [9]
 The importance of the Commission's study in shaping the Federal Aviation Act is apparent from the degree to which the Act as passed reflects the recommendations made by the Commission. The Commission's influence has been frequently noted. See 42 Notre Dame Law. at 326; 60 Harv.L.Rev. at 1249
 In this instance, the Commission's report is the primary source of legislative history. The Committee reports simply reiterate the language of the Act. See H.Rep.No. 2254, 75th Cong., 3d Sess. 7 (1938) ("This section imposes a duty ... to provide adequate service"); H.Rep.No. 2635, 75th Cong., 3d Sess. 24 (1938) (Conference Report) (same). During the debate on the bill, neither house discussed this section. The debate dealt primarily with the organization of the agency-whether it should be separate or part of the ICC-and the clause grandfathering in existing carriers. See 83 Cong.Rec. 6847-69, 7064-7104 (1938).
 
 
 [10]
 See 49 U.S.C. § 308 (amended version codified at 49 U.S.C. § 10932(d)). This section provided that "no terms, conditions, or limitations shall restrict the right of a carrier to add to his or its equipment and facilities over the routes ... specified in the certificate, as the development of the business and the demands of the public shall require."
 
 
 [11]
 In response to Eastern's first motion to dismiss, the Diefenthals argued that they had a "private right of action emanating from 49 U.S.C. §§ 1324, 1374 and 1377 and the regulations promulgated pursuant to these statutes." The emanation which the Diefenthals seek to enforce was never specified. However, their reference to the sections the CAB relied on in promulgating section 252 indicates the basis of their argument is that the CAB exceeded its authority in promulgating section 252. At oral argument before this panel, counsel for the Diefenthals conceded that the validity of this claim depended on the validity of the claim raised in their petition for review
 
 
 [12]
 Fitzgerald v. Pan American Airlines, 229 F.2d 499 (2d Cir. 1956), was the first case to find a private right of action to enforce section 1374(b). Fitzgerald expressly relied on the common law presumption that the violation of a statute entitled the person harmed to enforce the statute. See id. at 501. Other courts, which found an implied right of action under section 1374(b) prior to Cort v. Ash, have either relied on Fitzgerald or adopted similar reasoning. See, e.g., Nader v. Alleghany Airlines, 512 F.2d 527, 537 (D.C.Cir.1975) (relying on Fitzgerald ), rev'd on other grounds, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); East Haven v. Eastern Airlines, 282 F.Supp. 507 (D.Conn.1968) (relying on Fitzgerald ); Wills v. Trans World Airlines, 200 F.Supp. 360 (S.D.Cal.1961) (relying on Fitzgerald )
 Since Cort v. Ash, some courts have continued to recognize a private right of action. See Smith v. Piedmont Aviation, 567 F.2d 290 (5th Cir. 1978) (upholding damages for bumping without discussing the existence of a private right of action). The majority of circuits have found that a private right of action does not exist. See Kodish v. United Airlines, 628 F.2d 1301, 1302-03 (10th Cir. 1980); Caceres Agency v. Trans World Airways, 594 F.2d 932, 933 (2d Cir. 1979) (denying travel agents right of action); Mason v. Belieu, 543 F.2d 215, 221 (D.C.Cir.1976) (denying person at information counter right of private action); Polansky v. Trans World Airlines, 523 F.2d 332 (3d Cir. 1975) (denying tour members right of action).
 
 
 [13]
 The court in Polansky treated the question of whether the statute had been violated as indicative of whether the statute had been enacted for the special benefit of a particular class. See 523 F.2d at 335-36. What conduct a statute forbids, however, is analytically separable from whether Congress enacted the statute for the special benefit of a particular class. See Cannon v. University of Chicago, 441 U.S. 677, 690-93, 99 S.Ct. 1946, 1954-55, 60 L.Ed.2d 560 (1979). Introducing the question of a violation into the private-right-of-action analysis poses a danger that a court will lapse back into the common law presumption that a violation alone implies a private right of action. While we agree with the Third Circuit's interpretation of the scope of the statute, we prefer to treat the issue of violation separately from the issue of a cause of action
 We do not suggest that either ad hoc intentional racial or similar class-based discrimination, or discriminatory general airline rules, respecting in-flight service or accommodations, could not be the subject of a private cause of action under section 1374(b). The case before us presents nothing of this kind.
 
 
 [14]
 At the hearing on Eastern's second motion to dismiss, counsel for the Diefenthals suggested that other tortious conduct had occurred. In response to the district court's statement, "I don't know what it is this lady said to your people," counsel replied, "Well, basically, it was the confrontation that took place after the smoking incident, the way we were treated. Mr. and Mrs. Diefenthal were treated in a manner such to create a tort." This elliptical, unsupported reference was the first and only suggestion that any other offensive conduct had occurred. It was insufficient to provide support for the Diefenthals' claim for damages
 
 
 [15]
 Each of the Diefenthals may aggregate his tort and contract claims in order to satisfy the $10,000 jurisdictional minimum. See Edwards v. Bates County, 163 U.S. 269, 16 S.Ct. 967, 41 L.Ed. 155 (1896). However, because the claims are separate and distinct as to each plaintiff, the two plaintiffs may not add their own individual claims together in order to reach the jurisdictional minimum. See Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969)
 In arguing that each of them has satisfied the $10,000 amount in controversy, the Diefenthals have relied exclusively on the damages flowing from their allegedly tortious treatment. However, even if we assume that they are entitled to recover the full price of their airfare under the contract claim, we still find that the jurisdictional amount was not satisfied.
 
 
 [16]
 At oral argument, the Diefenthals' counsel was hardpressed to explain how the jurisdictional amount was satisfied in this case. His argument rested almost solely on a plea to permit the Diefenthals to prove their claim in court