Curtis Lee **THOMAS**, Plaintiff,

v.

**HUMBLE OIL & REFINING COMPANY,**
**Defendant.**

**Civ. A. No. 6750–N.**

United States District Court
E. D. Virginia,
Norfolk Division.

Nov. 15, 1968.

Ralph Rabinowitz, Norfolk, Va., for plaintiff.

Guilford D. Ware, Norfolk, Va., for defendant.

MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

Plaintiff, a seaman employed by defendant, seeks a recovery for maintenance at the rate of $8.00 per day for a total period of 221 days, covering the following periods of disability while an outpatient:

December 25, 1963, through March 10, 1964—77 days

March 31, 1964, through August 13, 1964—136 days

October 1, 1964, through October 8, 1964—8 days

The threshold question is the effect, if any, of certain noncontributing benefits paid by the defendant to the plaintiff during the periods of his disability; the total amount paid being substantially in excess of what would have been paid to plaintiff by way of maintenance. A secondary question is the legal effect of various releases given by plaintiff to the defendant.

Plaintiff was first employed by defendant in 1950. From that time until his retirement in 1967, he signed Articles as a member of a crew aboard various vessels owned and operated by the defendant in the capacity of messman, oiler and wiper. As such, he was characterized as among the unlicensed personnel.

Humble and the Esso Seaman's Association have entered into a collective bargaining agreement governing the relationship between the master and unlicensed personnel. The various Shipping Articles, signed by crewmen when boarding a vessel operated by defendant, make specific reference to such collective bargaining agreement.[1] An examination of the agreement between Humble and Esso Seaman's Association discloses the following:

"*Maintenance and Cure*

"Maintenance payable under the General Maritime Law on account of disability due to injury or illness incurred in the service of the vessel shall be paid at the rate of eight dollars ($8.00) per day.

"Maintenance shall not be paid concurrently with payments under the Disability Benefit Plan, if applicable, unless the maintenance due is in excess of plan payments, in which event the $8.00 rate as herein provided will apply. In such a case a differential will be paid which, when added to plan payments, will total payments to the level of the full maintenance due."

The plaintiff was originally injured in August 1957, when he fractured his right wrist. Apparently the fracture did not heal properly and from time to time thereafter plaintiff experienced occasional swelling, pain and stiffness which resulted in his visiting at least three Public Health Service Hospitals over a period of six years.

On December 20, 1963, Thomas was unable to stand his regular watches aboard the ESSO WASHINGTON because of intense pain and suffering. When the vessel arrived at Boston on December 23, 1963, Thomas was sent to a company doctor and told to report to the nearest United States Public Health Service Hospital which was at Boston. As this was the end of the vessel's voyage, Thomas was also discharged from the crew but, unlike other seamen working out of a Union Hall, he remained on the roll of employees for Humble.

Rather than report to the hospital at Boston, Thomas elected to return to Norfolk where, on December 25, 1963, he

1. Included within the various Articles of Agreement is the following:
"The terms and conditions set forth in the Collective Bargaining Agreements between Humble Oil and Refining Company and the Jersey Standard Tanker Officers Association, the Esso Radio Officers Association, the Esso Stewards Organization and the Esso Seamen's Association will be applicable between the master and licensed deck and engine officers, radio officers, stewards, and unlicensed personnel respectively."

was treated at the United States Public Health Service Hospital. He continued to receive treatment as an outpatient until March 11, 1964, when he was admitted for surgery on the wrist which was performed on March 16, 1964. He was discharged from the hospital on March 31, 1964, as not fit for duty. On August 13, 1964, Thomas returned to a fit-for-duty status and, in September, he went aboard the ESSO BALTIMORE as an oiler. During this period of service Thomas experienced pain and swelling in the left shoulder. He was treated at the United States Public Health Service Hospital as an outpatient beginning October 1, 1964, and again returned to fit-for-duty status on October 8, 1964.

In addition to his claim for maintenance, plaintiff seeks his expenses of transportation and food from Boston to Norfolk. Plaintiff concedes that he knew Humble's policy of getting injured seamen to the nearest Public Health Service Hospital. He never requested his employer to pay these expenses and knew that he would not be entitled to same. We think it sufficient to dispose of this matter by referring to the collective bargaining agreement between Humble and the Esso Seaman's Association [2] where it said:

"Transportation will be furnished as follows in certified disability cases: "Travel from the port at which the employee leaves his ship to the nearest city in which is located a U. S. Public Health Service Hospital or other U. S. Public Service facility."

After receiving instructions to report to the hospital in Boston, plaintiff made no attempt to persuade his employer to let him go to Norfolk. He took it upon himself to go to Norfolk, presumably because his family was there and Christmas had arrived. While the amount involved is *de minimis*, the principle is of importance. It is to the interest of the injured or ill seaman that he be examined at a nearby hospital at the earliest date possible. In short, the seaman ordinarily does not have the right to select his own physician or hospital. Roberson v. S/S American Builder, 265 F.Supp. 794 (E.D.Va., 1967), and authorities therein cited. The claim for transportation expense and food in transit is disallowed.

Reviewing the Humble Benefit Plan, with specific reference to the Disability Plan, we note that slightly different provisions are made for *industrial disability* and *nonindustrial disability*. The plaintiff's condition was classified as a nonindustrial disability due to the legal implications arising from the definition of the term. In the Glossary, which is a part of the Humble Benefit Plan, "industrial disability" is defined as disability resulting from accidental injury or occupational disease that is "compensable under the applicable workmen's compensation law, or if no workmen's compensation law is applicable, compensable under the workmen's compensation law that the employer designates." In turn, "nonindustrial disability" means disability that is not an "industrial disability." Seamen are not covered, and are expressly excluded, by the Virginia Workmen's Compensation Act and the Longshoremen's and Harbor Workers' Compensation Act. Humble has apparently designated the New Jersey Workmen's Compensation Act as controlling if no workmen's compensation law is applicable, but the point is not pressed as to what these benefits would have been.

Since plaintiff was correctly classified under "nonindustrial disability," and having completed ten (10) years of service as an employee, he was entitled to

---

2. Plaintiff testified that he did not belong to the Esso Seaman's Association, and was not required to be a member as a prerequisite for holding his job. Whether he was a member of the Association is immaterial. The Shipping Articles incorporated the collective bargaining agreement as a part of the seaman's contract. The plaintiff was entitled to the benefits and operated under all reasonable limitations therein contained.

receive twenty-six (26) weeks of normal compensation (defined as compensation that the employer determines would be paid in normal circumstances), and thereafter twenty-six (26) weeks of one-half normal compensation, if his disability continued throughout that period. What Thomas received is best demonstrated by the various forms he signed, entitled "Promise of Benefits and Release of all Rights," which set forth the agreement between the parties as follows:

"1. For each week, or part of week, that I am disabled after leaving the vessel:

"Full pay at the rate of $116.54 per week, up to and including 26 weeks. While not receiving board and lodging, or an allowance therefor, an additional sum of $1.20 per day;

"2. For each week, or part of week, thereafter, that I am disabled:

"One-half (½) pay at the rate of $58.27 per week, up to and including 26 more weeks. While not receiving board and lodging, or an allowance therefor, an additional sum of $.60 per day. The total under this Item 2 shall not be less than $56.00 per week during outpatient status until such time as there is not a reasonable possibility of cure;

"3. For the period thereafter that I am disabled, while not receiving board and lodging, maintenance of $8.00 per day until such time as there is not a reasonable possibility of cure."

■ If the Humble Benefit Plan is to be given any effect, plaintiff agrees that he has received all benefits due thereunder. He claims, however, that the Benefit Plan is for all employees of Humble and that he is entitled to these benefits *plus* the maintenance benefits due under General Maritime Law. Disagreeing

with plaintiff, we disallow the plaintiff's claim in its entirety.[3]

Manifestly the Disability Plan, as applied to seamen, was drawn with full knowledge of the rights of seamen as to maintenance and cure. The ill or injured seaman has a right to seek benefits under the Plan or he may, at his election, maintain an action under the Jones Act as well as a claim for maintenance and cure. He may, therefore, disregard the Disability Plan and seek his remedy as any other seaman employed from a Union Hall without regard to the identity of the shipowner. Under the Disability Plan, plaintiff became "eligible" for the benefits therein provided, but it does not follow that a seaman may collect all benefits under the Plan and then, in addition, collect maintenance under General Maritime Law.

A clear analogy is drawn with the land-based employee who is injured in an industrial accident and is entitled to receive benefits under a State Compensation Act. The Disability Plan does not permit a double recovery. As stated in the "Guide To Your Employee Benefits," distributed to all employees:

"The amount of disability benefits is not in addition to any *government benefits* that may be payable for the same period of absence. Instead Company benefit payments and government benefits are added together to total the amounts shown. For instance, the amount of benefits takes into account any disability benefits payable for the same period under the Social Security law or under a state disability benefit law, or under a workmen's compensation law. The amount may also include any other compensation paid by the Company for the same period, such as holiday pay."

This is likewise set forth in the Disability Plan, sec. 3.2, where it refers to

---

3. While unnecessary to consider, even if incorrect in the conclusion stated above, this would not be a case for the award of damages by way of attorneys' fees under Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88. See discussion of authorities on this point in Roberson v. S/S American Builder, 265 F.Supp. 794, 799 (E.D.Va., 1967).

"an amount that, when added to basic payments, equals the following." The term "basic payments" is defined in the Glossary as meaning all payments that are either (1) government benefits to which the employee is entitled for the period and disability in question, or (2) compensation payable by the employer for the period in question. And the term "government benefit" is defined as the amount of a pension, benefit or allowance *under any law* other than war veterans' legislation. Manifestly this Disability Plan was not intended to permit a double recovery, other than such benefits as may be paid under war veterans' legislation.

■ It is true that the ·Disability Plan provides that Humble may deny benefits to an employee who does not execute and deliver such releases and take such other steps as are prescribed by Humble. However, it must be remembered that this is a noncontributory plan, at no cost to the employee, and there is no logical reason why, since the employee is not required to seek benefits under the Disability Plan, the employer should not be permitted to require a release before paying twice.

Plaintiff grounds his argument on the spirit of the rule stated in Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), wherein the Supreme Court declined to permit a setoff for wages earned by the seaman during the period when he would otherwise be entitled to maintenance. In essence, plaintiff argues, the benefits under Humble's Disability Plan are merely a collateral source as indicated by Judge Sobeloff in his dissent in Vaughan v. Atkinson, 291 F.2d 813, 818–819 (4 Cir., 1961), referring to United States v. Price, 288 F.2d 448 (4 Cir., 1961). Further, plaintiff contends, the contracts which plaintiff signed are void and cannot be enforced under Blanco v. Phoenix Compania De Navegacion, S.A., 304 F.2d

13, 9 A.L.R.2d 410 (4 Cir., 1962). Since all of the cases heretofore cited in this memorandum were originally decided by the author of this opinion, it is safe to say that the court has some familiarity with the facts and issues presented in each case.

That plaintiff was aware, at least in general terms, of the benefits provided by the Humble Disability Plan and the collective bargaining agreement between Humble and the Esso Seaman's Association is best evidenced by the fact that, prior to the disability periods for which plaintiff now claims maintenance, he applied for, received benefits, and executed releases,[4] on several occasions.

■ Obviously Humble has recognized its obligation to pay maintenance, to the extent of $8.00 per day, in one form or another. The "Promise of Benefits" provides for a sum in addition to normal compensation while not receiving board and lodging. More significant is the fact that, while the employee is receiving only one-half pay, it is stated that the total payment shall not be less than $56.00 per week during outpatient status until such time as there is not a reasonable possibility of cure. Finally, it is provided that even after the period of 52 weeks has been exhausted, maintenance at the rate of $8.00 per day shall be continued until such time as there is not a reasonable possibility of cure. These facts completely destroy plaintiff's argument that the execution of a release is a cutoff of seaman's benefits.

■ It may be true that the word "maintenance" is not specifically mentioned in the Humble Benefit Plan. It is not the text of the Plan which controls the legal effect of the transaction between the parties; it is the actual terms of the agreement which they entered into. The agreement clearly included maintenance in the agreed sum of Disability Plan payments.

4. Even after the disability periods for which plaintiff now claims maintenance, plaintiff applied for, received benefits,

and executed releases, on September 13, 1966, and May 16, 1967.

Unlike *Blanco,* supra, this is not an effort on the part of the shipowner to limit its liability or otherwise derogate from the general rights and privileges of seamen. As Judge Sobeloff pointed out in *Blanco,* quoting from Justice Story, if additional compensation is allowed the stipulation in the shipping articles is generally upheld. This plaintiff knew of the effect of maintenance claims as related to Humble's Disability Plan and, in addition, he received considerably more than he would have otherwise received had he not sought to participate in the Plan. Indeed, to destroy the operative effect of the Disability Plan and to permit the collection of maintenance as an additional award would result in an adverse effect upon all seamen employed by Humble. They would, in all probability, be expressly excluded from the Plan and thus reduced to the $8.00 per day standardized allowance.

■ We do not draw the same comfort as does plaintiff's counsel in efforts to declare the Humble Disability Plan a collateral source payment. Unlike Price, supra, and United States v. Harue Hayashi, 282 F.2d 599, 84 A.L.R.2d 754 (9 Cir., 1960), where the employee mandatorily contributed to the respective funds which gave rise to the benefits paid, plaintiff contributed nothing to the fund used for the payment of benefits under the Disability Plan. While we do not treat the present case as an appropriate one for the application of setoff or diminution, we feel that, if applicable, the controversy here existing is more in line with Brooks v. United States, 337 U.S. 49, 53–54, 69 S.Ct. 918, 93 L.Ed. 1200 (1949), and its sequel, United States v. Brooks, 176 F.2d 482, (4 Cir., 1949), wherein the court held that any award against the United States should be diminished by the amount received or to be received by way of disability benefits paid by the Government. We hold that disability payments under the Humble Disability Plan are "gratuity" payments which may be considered as an alternative to the payment of maintenance to an ill or injured seaman. The entire scheme of the Disability Plan is to fully protect the seaman from any loss of income during the first 26 weeks, and to partially protect him thereafter for an additional 26 weeks, but at no time will the income be diminished below the amount which would otherwise be paid to the seaman by way of maintenance, either during the first 52 weeks or thereafter until maximum recovery has been reached.

■ Even if we were to hold that the contractual agreements between plaintiff and Humble are void—which we do not—the fact remains that Humble has paid the plaintiff an amount considerably in excess of the amount allegedly due by way of maintenance.

■ We turn, finally, to the legal effect of the releases executed by the plaintiff. With full recognition of the fact that seamen's releases are suspect and must be carefully scrutinized to afford the seaman every protection, this is not the same as saying that all seamen's releases are invalid. In the leading case of Garrett v. Moore-McCormack Co., 317 U.S. 239, 248, 63 S.Ct. 246, 252, 87 L.Ed. 239 (1942), it is said:

"We hold, therefore, that the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding."

As *Garrett* was, in part, an action for maintenance and cure, it is authority for the point that a valid release may be obtained from a seaman as to his claim for maintenance, if the burden of proof has been met.

■ While the plaintiff had only a third-grade level of formal education and is limited as to his ability to read and write, he successfully passed an oral examination given by the United States

Coast Guard to become an oiler. On occasions when he executed the release forms, he read them aloud and filled in certain blanks on at least seven different occasions. He made regular entries in the engine room log as a part of his duties as oiler. There was abundant evidence to the effect that the document was fully explained to him, as was the nature of the transaction, and on each occasion plaintiff stated that he understood same. The "Promise of Benefits and Release of all Rights" form is, in itself, a model of clarity and fairness. It seems to have been designed in accordance with the form approved in Bonici v. Standard Oil Co. of New Jersey, 103 F.2d 437 (2 Cir., 1939), where Circuit Judge Clark held that a release fairly entered into and fairly safeguarding the rights of the seaman should be sustained. Judge Clark then made the following cogent statement:

> "Any other result would be no kindness to the seaman, for it would make all settlements dangerous from the employer's standpoint and thus tend to force the seaman more regularly into the courts of admiralty. Even if a seaman is the court's ward, the court cannot be always at hand to watch over him, for it can only move ponderously in a formal lawsuit. Fair settlements are in the interest of the men, as well as of the employers."

The plaintiff did testify that there was some representation made concerning an additional settlement which would be paid to him under the New Jersey Workmen's Compensation Act, and that he signed the releases with this understanding. Humble's representative, Boyce, denies any such conversation. However, as this action is only for maintenance and as Thomas makes no claim that he misunderstood the effect of the release on his maintenance claim, this point is immaterial. The record does not disclose whether a seaman's claim for injuries is covered under the New Jersey Act.[5] Assuming arguendo that it is covered, the amount due thereunder would not, under the Humble Disability Plan, be an *additional* payment.

Following each occasion where the "Promise of Benefits and Release of all Rights" form was executed by plaintiff, the form was processed and a check was mailed or delivered to plaintiff. Upon receiving each check, Thomas signed,[6] dated, and mailed or redelivered to Humble a card reading substantially as follows:

> "*ACKNOWLEDGMENT-DISABILITY BENEFIT PAYMENT*
>
> "I know that if all or part of this payment is made under the terms of a RELEASE which I executed because of disability, that said RELEASE is

5. With respect to the New Jersey law, as well as the interrelationship of payments for maintenance with payments under the New Jersey Temporary Disability Benefits Law, the case of Seatrain Lines, Inc. v. Medina, 39 N.J. 222, 188 A.2d 169, 1965 A.M.C. 329 (1963), provides an interesting discussion as to self-insured plans for employee disability benefits. In that case, the seaman received maintenance payments of $8.00 per day, a reverse of the facts in the instant case. The New Jersey statute provided that no benefits "shall be required or paid * * * for any period with respect to which benefits are paid or payable under any unemployment compensation or similar law, *or under any disability or cash sickness benefit or similar law*, of this State or of any other State, or *of the*

*Federal Government.*" The New Jersey Supreme Court held that the seaman was not entitled to benefits under the Temporary Disability Benefits Law because he had already received maintenance under an established principle of law enunciated by the Federal Government. The Humble Disability Plan is far more favorable to the seaman and Seatrain Lines, Inc. v. Medina is illustrative of the operative effect in the event a seaman fails to seek the benefits of the Plan.

6. There is testimony that plaintiff's mother may have signed a number of these forms, but plaintiff does not contest the authority of his mother to receive the check. There are, of course, many forms admittedly signed by the plaintiff.

in full force and effect and that I have no further claim against the Company in respect of the matters set forth in the RELEASE except the payment(s) therein specified. Should this be the last payment provided for by the RELEASE then I acknowledge that the Company's obligation has been fulfilled and that I have no further claim under the RELEASE."

We find that Humble has fully met the burden of proving that the release is valid in every respect, but we do not believe it necessary to decide the case on this point.

Let a judgment order be presented for entry.