Donald J. DURDEN,
Plaintiff-Appellant, Cross-Appellee,

v.

EXXON CORPORATION, et al., Defendants,

and

Dominance Shipping, Inc., Defendant Third Party, Plaintiff-Appellee, Cross-Appellant,

Sanko Kisen, USA Corp. and Deborah Maritime Corp., et al., Defendants-Appellees, Cross-Appellants,

and

AMERICAN EMPLOYERS INSURANCE CO., Defendant-Appellee,

v.

A/S SCANTANK, Defendant-Cross-Appellee,

and

A.J. Bertucci Construction Co., etc., Third Party Defendant-Appellee, Cross Appellee.

No. 85–3421.

United States Court of Appeals, Fifth Circuit.

Nov. 3, 1986.

Garner & Munoz, Dan C. Garner, John G. Munoz, New Orleans, La., for Durden.

William E. Wright, Jean Melancon, New Orleans, La., for Sanko.

William E. Wright, Jean Melancon, New Orleans, La., for Dominance.

Camp, Carmouche, Barsh, Gray, Hoffman & Gill, P.L.G., Brian G. Meissner, New Orleans, La., for Bertucci and American employers.

Robert B. Deane, James R. Holmes, New Orleans, La., for A/S Scantank.

Before WISDOM, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

WISDOM, Circuit Judge:

The plaintiff in this action alleges that he was injured as a result of a near allision of a vessel with a tugboat and moored barges on the Mississippi River. At the close of the plaintiff's case, the district court directed a verdict against the plaintiff on his Jones Act claim and dismissed the jury. On his other claims, the district court exonerated the vessel M/V SANKO PRESTIGE, *in rem*, and granted judgment for Dominance Shipping, Inc., the owner of the vessel, on the claims *in personam*. On appeal, the plaintiff makes three major contentions. First, he contends that the court erred in upholding the validity of the release of his employer as the basis for dismissing his Jones Act claim. Second, he contends that the court erred in deciding his other claims instead of submitting them to a jury. The plaintiff had pleaded both admiralty jurisdiction and diversity jurisdiction. Third, he contends that the trial judge's findings of fact and conclusions of law are erroneous. We affirm.

### I.

A.J. Bertucci Construction Company of New Orleans, Louisiana, employed Donald Durden, the plaintiff, as captain of the tugboat, CAPTAIN CHARLES. On March 17, 1980, the CAPTAIN CHARLES with a tow of nine barges arrived at the company's fleeting area on the east bank (New Orleans side) of the Mississippi River at the Carrollton Bend/Upper Nine Mile Point in the City of New Orleans. The tow consisted of eight rock barges used in the construction of levees and a single empty grain barge. The barges were lashed together with steel cables.

On the afternoon of March 17th, Captain Durden was in the wheelhouse of the CAPTAIN CHARLES, which was tied to the empty grain barge and one of the rock barges at the upstream end of the two barges. The weather was foggy and there had been intermittent rain. Captain James Jackson, Sr., an experienced tugboat captain, who is the plaintiff's uncle and brother-in-law, was in the wheelhouse of a sec-

ond tug, the CAPTAIN DANNY, at the downstream end of the tow close to the river bank.

Late that afternoon, Captain Jackson's radar picked up a vessel heading downriver. He radioed to Captain Durden that the vessel "doesn't look like it's going to make it". At about the same time Captain Durden sighted the vessel, which appeared to be headed toward the Bertucci barges. Durden ordered his men to run to the inside barges. He then left the wheelhouse of the CAPTAIN CHARLES and, along with the deckhand, crossed the grain barge. The deckhand successfully leaped onto an adjoining rock barge. Durden expected to jump too, but could not find an empty space on the rock barge. When he attempted to stop short, he slipped on the deck of the grain barge and fell over its side. As he fell, he injured his shoulder when he grasped a timberhead on the end of the grain barge with his left arm, placing his entire weight on his left shoulder. After a brief time Durden was able to lower himself to the rock barge and to run to a barge closest to the river bank.

The vessel, the M/V SANKO PRESTIGE, passed without doing any damage to the barges or the tug. No one complained at that time. The log of the M/V SANKO PRESTIGE shows no unusual manuevers at Carrollton Bend. An expert testified that the pilot would have increased the ship's speed if an allision had been imminent.

Durden later experienced increasing pain and weakness in his shoulder. He has had three operations, and he is no longer able to work as a tugboat captain.

In August 1982, Durden settled his Jones Act claim against Bertucci, his employer, for $87,000. He was not represented by counsel.

In November 1982 Durden filed this action against the M/V SANKO PRESTIGE *in rem* and against the owners and operators of the vessel *in personam* for person-

al injuries caused by the negligent navigation and unseaworthiness of the M/V SANKO PRESTIGE. The original complaint did not name Bertucci or its insurer, American Employers Insurance Company, as defendants. In May 1984, shortly before the first trial setting, Durden filed a third amended complaint adding a Jones Act claim against Bertucci and American Employers. The original complaint and the amended complaint alleged both admiralty jurisdiction and diversity jurisdiction, and prayed for a trial by jury.

The case came on for trial before a jury. At the close of the plaintiff's evidence, the district court directed a verdict for American Employers, holding that the plaintiff had executed a valid release on his Jones Act claim. Because the plaintiff had pleaded admiralty jurisdiction, the court dismissed the jury and resumed the trial as a non-jury admiralty case. The district court decided in favor of the defendants, holding that:

> The "faults" relied upon by plaintiff, alleged excessive speed, failure to sound fog signals and failure of the master of the SANKO PRESTIGE to intervene and wrest control of the vessel from the pilot, are not faults which caused plaintiff's injury. The cause was plaintiff's sincere, but mistaken and unreasonable, belief that a collision was imminent.

## II.

### A. *The Release*

Admiralty courts scrutinize a seaman's release to determine whether the seaman fully understood his rights and the consequences of the release. A release is not valid unless it has been executed without deception or coercion.[1] If the seaman establishes a genuine issue of material fact concerning the validity of the procurement

---

1. *Halliburton v. Ocean Drilling and Exploration Co.,* 620 F.2d 444 (5th Cir.1980); *Charpentier v. Fluor Ocean Services, Inc.,* 534 F.2d 71 (5th Cir.1976); *Gueho v. Diamond Drilling Co.,* 524 F.2d 986 (5th Cir.1975).

of the seaman's release, the issue is to be decided by the jury.[2]

■ Durden does not suggest that he was coerced or deceived into settling his claim. He points out that he signed the release without the advice of counsel, that he was depressed, and that he had not given up hope that his shoulder might improve. None of these assertions is sufficient to undermine the district court's conclusion that Durden fully understood his rights and the consequences of his action.

Following the third operation, Durden was told by his doctors that they could do nothing more for him except fuse his shoulder joint, an operation that Durden refused to have. Durden understood that he could not return to work as a tugboat captain, and Bertucci made no representations about future employment in any capacity. During the settlement discussions, Bertucci's attorney told Durden that Durden was entitled to retain his own attorney. Durden understood that he was settling his claim against Bertucci for $87,000, but retaining his rights against Dominance Shipping, Inc., the owner of the M/V SANKO PRESTIGE. Given the risks of litigation, the amount of the settlement is not clearly

inadequate. The plaintiff must live with his bargain.[3]

The district court did not err in dismissing the plaintiff's Jones Act claim on a motion for a directed verdict.

### B. Jury Trial

■ Durden's accident occurred March 17, 1980. He filed his first complaint in November 1982. The case was set for trial in early July 1984. During the last week of May 1984 Durden filed his third amended complaint asserting for the first time a Jones Act claim. Had the district court not dismissed that claim, Durden could have presented it and his related maritime claims to a jury.[4] After the dismissal of the Jones Act claim, there remained only the claim against the SANKO PRESTIGE in rem and a claim against the shipowner in personam for the unseaworthiness of the vessel and its negligent operation.[5] Because of Durden's settlement with his employer, there was no Jones Act claim to go to the jury and the trial court could, as it properly did, take for itself the determination of the remaining claims, which were subject to the admiralty jurisdiction of the

2. *German v. Carnegie-Illinois Steel Corp.,* 169 F.2d 715 (3rd Cir.1948); *Blake v. W.R. Chamberlin,* 176 F.2d 511 (9th Cir.1949); *Scola v. Boat Frances R. Inc.,* 546 F.2d 459 (1st Cir.1976); *Guerrero v. American Hawaiian S.S. Co.,* 222 F.2d 238 (9th Cir.1980); 1 M. Norris, *The Law of Seaman* Section 504, at 600 (1970).

3. The trial judge ruled from the bench:
THE COURT: Having heard the evidence in the case, in the plaintiff's case on the issue of the receipt and release, I find as a matter of fact, that the plaintiff was fully informed of his rights, that he had a full appreciation of the settlement consequences at the time of the signing of the receipt and release, and that it was supported by adequate consideration. Even though he was not represented at the time of the release by counsel, he had an opportunity to obtain counsel and he understood that right.
But, I am impressed by the extent of the plaintiff's own knowledge, and those issues that raised a doubt in my mind on summary judgment are completely eradicated by the facts. One of those issues was his understanding, and I am satisfied that he did understand, fully comprehended the nature and consequences of the release.

Another issue that inhibited me from granting summary judgment was the statement that he had been promised employment. And I find that there was no such promise at the time the release was signed.
Moreover, at the time that the release was executed, the medical evidence was that he had reached the point of cure that could progress only by fusion, which the plaintiff had full knowledge and understanding of, and had elected, and still to this day has elected, not to pursue.
I think, therefore, that the release is fully valid and enforceable, and that the defendant American Employers Insurance Company is entitled to a directed verdict.

4. *Fitzgerald v. United States Lines,* 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963) held that when a Jones Act claim is presented to a jury, unseaworthiness and maintenance and cure claims arising out of the same set of circumstances must also go to the jury.

5. The plaintiff made no attempt to introduce evidence of Bertucci's negligence. The district court properly granted a motion for a directed verdict in favor of Bertucci.

court. If the rule were otherwise, any plaintiff who could allege diversity jurisdiction could receive a jury trial on his admiralty claims simply by alleging a Jones Act count, whether or not he had any evidence to support it and whether or not he had settled the claim. The time has not yet come when a plaintiff is entitled to a jury in every admiralty action.

Durden's original complaint alleges jurisdiction under "Title 28 § 1332 [the diversity provision] of the United States Code and/or the General Maritime Law of the United States". He also requested a jury trial. But he brought this action against the vessel *in rem,* "invoking the unique power of the admiralty court." [6] Such an action falls "within the exclusive admiralty jurisdiction and could not be brought under diversity jurisdiction".[7]

This case is controlled by T.N.T. Marine Services v. Weaver Shipyards.[8] In *T.N.T. Marine,* the owner of a vessel sued a shipyard alleging, as in this case, both diversity and admiralty jurisdiction, requesting a jury, and bringing the action *in rem* against the vessel. There too the plaintiff made no reference to Fed.R.Civ.Proc. 9, which directly addresses the issue. This Court held that the "plaintiff elected to bring the suit under admiralty jurisdiction, and cannot now complain about his right to a jury".[9]

Rule 9(h) provides, in pertinent part:

A pleading or count setting forth a claim for relief within the admiralty and maritime jurisdiction that is also within the jurisdiction of the district court on some other ground may contain a statement identifying the claim as an admiralty or maritime claim for the purposes of Rules 14(c), 38(e), 82, and the Supplemental Rules for Certain Admiralty and Maritime Claims. If the claim is cognizable only in admiralty, it is an admiralty or maritime claim for those purposes whether so identified or not.

Rule 38(e) of the Federal Rules of Civil Procedure provides that the identification of a claim as an admiralty or maritime claim carries with it the procedural consequence of a non-jury trial. It recites, in pertinent part, that the Federal Rules "shall not be construed" to claim a right to trial by jury of the issues of an admiralty or maritime claim within the meaning of Rule 9(h). *See also,* Rule 8 of the Federal Rules of Civil Procedure, providing that no "technical forms of pleading or motions are required" and supporting the *T.N.T. Marine Service* holding that a specific reference to Rule 9(h) is not required to make the claim one in admiralty with attendant admiralty procedure.[10]

In *T.N.T. Marine* the Court, pointing to the first sentence of the Rule, held:

Therefore, there is no right to a jury trial where the complaint contains a state-

**6.** *Johnson v. Venezuelan Line Steamship Co.,* 314 F.Supp. 1403, 1407 (E.D.La.1970).

**7.** *T.N.T. Marine Service v. Weaver Shipyards,* 702 F.2d 585, 587 (5th Cir.1983), *cert. denied,* 464 U.S. 847, 104 S.Ct. 151, 78 L.Ed.2d 141 (1983).

**8.** *Id.*

**9.** *Id.* at 588.

**10.** With the unification of admiralty rules, it was necessary to preserve those historical procedures traditionally attached to actions in admiralty, not the least of which was the non-jury trial. *See,* Advisory Committee Notes to Rule 9(h), Federal Rules of Civil Procedure. The solution that was applied was the preservation in Rule 9(h) of the plaintiff's right to choose the procedural consequences of a civil or admiralty

action, by choosing the jurisdictional basis of the action and designating that basis in the complaint. This solution complied with the existing procedural choice provided by the "savings of suitors" clause, codified in 28 U.S.C. 1333(1), the effect of which is that a suitor who holds an *in personam* claim, which might be enforced by a suit *in personam* in admiralty, may also, at his election, file suit at "common law", by the filing of an ordinary civil action, in state court or in federal court, without reference to "admiralty", given diversity and jurisdictional amount. Gilmore and Black, *The Law of Admiralty* 37, (2d Ed.1975), p. 37. Rule 9(h), in providing that a reference to admiralty results in the invocation of admiralty procedure, requires that all suits invoking admiralty jurisdiction continue to carry the election of the procedural consequences incident to admiralty procedure, despite the unification of civil and admiralty rules.

ment identifying the claim as an admiralty or maritime claim, even though diversity jurisdiction exists as well. *Romero v. Bethlehem Steel Corp.*, 515 F.2d 1249 (5th Cir.1975).

Continuing, the Court observed:

The second sentence of Rule 9(h) makes clear that Rule 38(e) denies a right to trial by jury on any claim that is cognizable only in admiralty, regardless of what the pleading says.... Applying these rules, we hold that the plaintiff elected to bring the suit in admiralty.

In *Romero v. Bethlehem Steel Corp.*,[11] cited in *T.N.T. Marine*, the Court said: "If both claims were in fact made in accordance with Rule 9(h), we would follow the authorities which hold that the existence of diversity as an alternative basis of jurisdiction will not entitle the plaintiff to a jury trial". In the first words of the complaint, Durden pleaded: "The complaint of Donald J. Durden against the M/V SANKO PRESTIGE, her engines, etc., *in rem*, Dominance Shipping, Inc., Exxon Corporation and Exxon Shipping Corporation, *in personam*...." In suing the vessel *in rem* he gained a significant advantage: the pilot's negligence is imputed to the vessel in a suit in admiralty. Moreover, admiralty suits routinely allow prejudgment interest, a rule that may or may not apply under applicable state law. In paragraph VI of the complaint Durden alleges that the "Court is vested with jurisdiction of this matter pursuant to the provisions of Title 28 Section 1332 of the United States Code and/or the General Maritime Law of the United States".

The district court properly dismissed the jury because the suit alleged admiralty jurisdiction, and properly shouldered the burden of deciding the factual dispute.

## C. *Evidence*

■ The evidence supports the judgment for the defendants. Estimates of how close the SANKO PRESTIGE came to the barges vary widely. The plaintiff's close relative, Captain Jackson, testified that the SANKO PRESTIGE missed the tow by 100 to 150 feet. He was in the wheelhouse of his ship which was 27 feet above the river level; in a better position, therefore, to judge distances than other witnesses who were on the bank. An expert testified that cables would have snapped if the M/V SANKO PRESTIGE had missed by less than 200 feet; there was no snapping of lines and no breaking of rigging. The ship's log does not reveal any emergency action to avoid a near collision. The pilot testified that he had no specific recollection of the passage through the Carrollton Bend on the date in question and had received no complaints about the alleged improper navigation until long after March 17, 1980. The master of the vessel testified by deposition that he did not recall the passage through the Carrollton Bend on March 17, 1980, and that he recalled no unusual event in the course of the passage; no near allision was reported to him until 1983. On the credited testimony, the district judge found that the SANKO PRESTIGE passed more than 200 feet from the Bertucci fleet on the day in question.

Durden argues that he is entitled to the benefit of the *Pennsylvania* Rule.[12] That rule of so-called "statutory fault" requires the shipowner "to carry the staggering burden of proof" that the "fault or violation 'could not have been' the cause of the accident".[13] Durden asserts that the defendants violated a rule of navigation requiring vessels to go at a moderate speed in a fog. The evidence does not show that the M/V SANKO PRESTIGE was going at an immoderate speed. The district court found that the "faults" relied on by the plaintiffs were not faults which caused the plaintiff's injury; the "cause was the plaintiff's sincere, but mistaken and unreasonable belief that a collision was imminent".[14]

---

**11.** 515 F.2d 1249 (5th Cir.1975).

**12.** 86 U.S. (19 Wall) 125, 22 L.Ed. 148 (1874).

**13.** Gilmore and Black, *The Law of Admiralty*, (2nd Ed., 1975) p. 898.

**14.** Although the district court held that the Rule is not "applicable" because "the Pennsylvania

We hold that the evidence supports the trial judge finding: The "plaintiff has failed to carry his burden of proving by a preponderance of the evidence the SANKO PRESTIGE was navigated without the care, judgment, and nautical skill which a competent mariner of ordinary prudence and skill would exercise under similar circumstances". The action against the defendants was properly dismissed.

The judgment in favor of all the defendants is AFFIRMED.[15]

Rule is expressly directed to situations in which a collision has occurred", this Court has applied it in other situations as well. *See United States v. Nassau Marine*, 778 F.2d 1111, 1116 (5th Cir. 1985). The Rule imposes such a drastic and unusual presumption that it is disfavored by commentators. *See generally*, G. Gilmore & C. Black, *The Law of Admiralty*, (2d ed. 1975) § 7–5.

15. The judgment dismissed the plaintiff's suit against Exxon and Exxon Shipping Company, which were time charterers. The judgment also dismissed the third-party suit of Dominance Shipping Company against Bertucci.