Rey CASTILLO, Carlos Abesamis,
Lauro Malinas, Emetrio Noble,
and Jerry Ramos

v.

SPILIADA MARITIME CORPORATION,
in personam and the M/V
SPILIADA, in rem.

Civ. A. No. 89–3769.

United States District Court,
E.D. Louisiana.

June 25, 1990.

Chester John Caskey, Richard J. Dodson,
Alfred Bruce Shapiro, Baton Rouge, La.,

Stephen Koslow, Quasha, Wessely &
Schneider, Washington, D.C., for plaintiff.

Robert Hugh Murphy, Peter Brooks
Sloss, Douglas L. Grundmeyer, Chaffe,
McCall, Phillips, Toler & Sarpy, New Orleans, La., for Spiliada Maritime Corp.

BEER, District Judge.

Plaintiffs are five Filipino seamen who
were discharged from Defendant Spiliada
Maritime Corporation's ("Spiliada") vessel,
M/V SPILIADA, in New Orleans on July 7,
1989. Plaintiffs assert wage and penalty
wage claims pursuant to U.S. Penalty
Wage Statute, 46 U.S.C. 10313.[1] Spiliada
filed a Motion for Summary Judgment, or
Alternatively, Motion to Stay Proceedings,
contending that plaintiffs entered a binding
and final settlement prior to the date this
suit was filed. Plaintiffs asserted their
own Motion for Summary Judgment, contending that the settlement they entered
prior to filing this suit is invalid since they
were allegedly coerced into entering it.

Plaintiffs also contend that this court's
jurisdiction over their wage claims is mandatory. Subject matter jurisdiction over
seaman wage claims is only mandatory,
however, if those claims are made in good
faith. *Abraham v. Universal Glow, Inc.*,
681 F.2d 451, 453 (5th Cir.1982). Thus, this
court reserved ruling on the cross motions
for summary judgment, and in order to
resolve whether it had jurisdiction in this
matter, scheduled an evidentiary hearing
on "the specific and single issue of fact [of]
whether plaintiffs acted in good faith when
they entered a settlement, renounced it,
and then filed this lawsuit." (Minute Entry, February 14, 1990). That hearing was
held on May 2–3, 1990. This court now
makes the following Findings of Fact and
Conclusions of Law.

FINDINGS OF FACT

1. Plaintiffs, Lauro Malinas, Rey Castillo, Carlos Abesamis, Jerry Ramos, and Emetrio Noble, are all citizens and residents of

---

1. Plaintiffs also make claims, which are derivative of their wage claims, for retaliatory discharge, "forced repatriation", mental anguish, and seek special compensatory damages for threats of lost employment opportunities.

the Philippines who served as seamen aboard M/V SPILIADA during 1988 and 1989. All five seamen were discharged from M/V SPILIADA on July 7, 1989 in New Orleans, and repatriated to the Philippines at Spiliada's expense.

2. M/V SPILIADA, a Liberian flag vessel, was owned at all pertinent times by defendant Spiliada, a Liberian corporation. The M/V SPILIADA was managed by defendant's agent, Buenamar Compania Naviera ("Buenamar"), a Greek company.

3. Plaintiffs obtained their employment aboard the M/V SPILIADA through a "manning agency" in the Philippines, Philgrecian Maritime Services ("Philgrecian"). Whereupon plaintiffs boarded M/V SPILIADA with a large sealed envelope from Philgrecian containing employment contracts and notarized undertakings to be hand delivered to the vessel's master. (Plaintiffs' Exhibit # 5). According to those contracts and undertakings, the base monthly wage of plaintiffs Abesamis, Castillo, Ramos and Noble was 6,006 Philippine pesos ($276), and the monthly wage of plaintiff Malinas was 4,010 Philippine pesos ($180). (*Id.*) In the column of the ship's articles captioned "Base Wages per Month", which plaintiffs signed, the notation "BIL AGR" appeared for each plaintiff. (Plaintiffs' Exhibit # 3). This notation referred to a Bilateral Agreement entered between the Union of Greek Shipowners and the Philippine Officers and Seaman's Union. (Plaintiffs' Exhibit # 4). In 1988, Buenamar had instructed Philgrecian to hire seamen pursuant to the terms of this Bilateral Agreement. The base monthly wages prescribed in that Bilateral Agreement for seamen in plaintiffs' various positions correspond to the wage rates specified in the contracts and undertakings

that plaintiffs brought with them via the sealed envelope when they boarded the vessel. (*Id.* at p. 13; Plaintiffs' Exhibit # 5).

4. Unknown to Buenamar, Philgrecian submitted versions of each plaintiffs' employment contracts for approval with the Philippine Overseas Employment Administration ("POEA") that contained higher wage rates than the contracts that plaintiffs carried with them aboard the vessel. (Plaintiffs' Exhibit # 1).[2] The contracts submitted to the POEA called for plaintiffs Abesamis, Castillo, Ramos and Noble to be paid 58,000 drachmas per month ($429), and for plaintiff Malinas to receive 55,000 drachmas per month ($407),[3] along with higher rates of overtime and leave pay than those provided in the contracts plaintiffs carried aboard the vessel (and provided for in the Bilateral Agreement). (*Id.*) Thus, the base monthly wages specified in the POEA approved contracts was $153 higher than the base wage specified in the contracts that plaintiffs took aboard the vessel for four plaintiffs (Abesamis, Castillo, Ramos, and Noble), and was $227 higher for the other plaintiff, Malinas.

Philgrecian also apparently altered the employment contracts that plaintiffs brought aboard the vessel to reflect the wage rates prescribed in the Bilateral Agreement. (Plaintiffs' Exhibit # 5). Buenamar at no time authorized Philgrecian to alter these employment contracts, and no one at Buenamar or aboard M/V SPILIADA altered the contracts. Rather, Buenamar had been advised that each of the plaintiffs had agreed to work for the wage rates contained in the Bilateral Agreement, as reflected in the copies of the contracts carried aboard the vessel and delivered to the master via sealed envelope by plaintiffs. (*Id.*)[4]

2. The POEA is a Philippine government agency which regulates the employment of Filipinos working abroad. The POEA prescribes rules and regulations for the employment of seamen and approves their employment contracts.

3. Drachmas is Greek currency.

4. Since the issue at hand is whether the plaintiffs acted in good faith by settling their claims, then renouncing that settlement and filing this lawsuit, it is unnecessary for this court to determine whether the Bilateral Agreement base wage or the POEA approved contract wage applies. The court will, however, necessarily address whether plaintiffs received adequate consideration in the settlement that they entered.

For the same reason, the court also does not address plaintiffs' contention that they should have been paid according to a separate Greek Collective Agreement. Nevertheless, the court notes that plaintiffs admit that they are not members of any Greek Seaman's union, have

5. Plaintiffs complained that they were being underpaid while aboard M/V SPILIADA, eventually contacting John Sansone of the International Transport Workers Federation ("ITF"), who presented their complaints to the vessel's master, Captain Marmaras, in New Orleans on July 6, 1989.[5] Sansone contacted officials in the Philippines, and learned of the wage rate discrepancy between plaintiffs' employment contracts that were approved and on file with the POEA, and those which plaintiffs brought aboard the M/V SPILIADA, which had been altered. When confronted with the discrepancy, Captain Marmaras indicated that plaintiffs were correctly being paid in accordance with the Bilateral Agreement, and the employment contracts aboard the vessel.

6. After further discussions failed to resolve the issue, plaintiffs were discharged on July 7, 1990, and promptly repatriated at defendant's expense to the Philippines. Under "Cause of Discharge" in plaintiffs' seaman's books, Captain Marmaras entered the caption "DUE ITF". Plaintiffs were paid the wages due to them at the time of discharge at the rates specified in the Bilateral Agreement and the employment contracts aboard the vessel.

7. Just prior to being repatriated, plaintiffs apparently signed an agreement authorizing Richard J. Dodson, an American attorney, to represent them.

8. In late July of 1989, Buenamar officials confirmed that Philgrecian had submitted contracts to the POEA for plaintiffs with higher wage rates than the contracts hand delivered to the captain by plaintiffs when they boarded the vessel. Captain Marmaras was instructed to reach an amicable settlement with plaintiffs in the Philippines. Marmaras contacted Philgrecian to determine whether plaintiffs would be interested in discussing settlement. Philgrecian contacted plaintiff Malinas,

who agreed to meet with Marmaras. This meeting took place on August 1, 1989. Malinas agreed to locate the other four plaintiffs and bring them to the offices of Pandiman Philippines, Inc. ("Pandiman") the following day.[6]

9. That same day, August 1, 1989, four of the plaintiffs, Castillo, Abesamis, Ramos and Malinas, met at the office of Philippine attorney Pompeyo Nolasco, who had been in contact with plaintiffs since their return to the Philippines in early July 1989, and also in contact with plaintiffs' American attorney, Richard Dodson. At that meeting, Nolasco showed the four plaintiffs a telefax letter from Dodson (dated July 26, 1989) in which Dodson advised that suit would soon be filed in the U.S. on plaintiffs' behalf, that the plaintiffs should report to Nolasco any contact made with them by the vessel owner, and that Dodson would provide plaintiffs with financial assistance, if necessary, throughout the course of the litigation of their claims in the U.S. (Defendant's Exhibit # 1). Nolasco explained this letter to plaintiffs in their native tongue of Tagalog. Also at that meeting, Nolasco showed the four plaintiffs a letter he was sending via telefax to Dodson (dated August 1, 1989) in which Nolasco advised Dodson that the four plaintiffs were in his office and wished to continue the prosecution of their claims in the U.S. (Defendant's Exhibit # 8). In that letter, which the four plaintiffs read and Nolasco explained to them, Nolasco cautioned Dodson that plaintiffs might find a settlement in the Philippines with the vessel owner too tempting to pass up. (*Id.*) Nolasco then had the four plaintiffs sign an acknowledgment handwritten on the second page of Dodson's July 26, 1989 letter in which the four plaintiffs acknowledged that they had read and understood both letters and agreed with their contents. (Defendant's Exhibit # 1).

never heard of the Greek Collective Agreement, and have never demanded or expected to be paid pursuant to a Greek Collective Agreement.

**5.** Besides their wage grievances, plaintiffs also complained about the food and conditions aboard the vessel.

**6.** Pandiman is an organization that assists shipowners, including assistance with seamen's claims.

At this August 1, 1989 meeting with Nolasco, the four plaintiffs present expressed concern about how long litigating their claims in the U.S. would take. When the four plaintiffs questioned Nolasco about whether they should consider settlement of their claims with the vessel owner, Nolasco advised them that any decision concerning settlement was "up to them."

10. On the morning of August 2, 1989, the next day, four plaintiffs, Castillo, Ramos, Malinas, and Noble went to Pandiman's office. Mr. Frederick Clemo of Pandiman participated in the discussion. Clemo asked plaintiffs if they had an attorney. Plaintiffs stated that they were being advised by Nolasco. They also stated that they had an American lawyer, although they could not remember his name. Captain Marmaras asked plaintiffs what their claims were. Plaintiffs responded that they should be paid by the rates prescribed in the contracts approved by the POEA. Marmaras, who apparently had authority to pay plaintiffs up to $4,000 apiece, offered to pay them $2,000 apiece in settlement. Plaintiffs rejected this offer, and immediately demanded $6,000 each to settle their claims. Captain Marmaras offered $4,000, which plaintiffs rejected.

At that point, plaintiff Castillo got up as if to leave. Clemo intervened and spoke privately with Castillo, advising him that the vessel owner, who he had already spoken with, was willing to pay each plaintiff $5,500. Castillo requested to call Nolasco, which he did. Nolasco advised Castillo that the decision was theirs and to go ahead with the settlement if they were satisfied. Castillo then accepted the proposed settlement. Clemo then spoke separately with Ramos, Noble, and Malinas and each one agreed to the proposed settlement of $5,500. This settlement was made contingent on acceptance on the same terms by the fifth seaman, Abesamis. It was agreed that all five plaintiffs would reassemble at Pandiman the next day.

11. The following day, August 3, 1989, all five seamen came to Pandiman's office between 9:00 a.m. and 10:00 a.m. Shortly thereafter, a Philippine attorney named Crisolitio Dionido arrived at Pandiman. Dionido had been requested by a fellow attorney, who Clemo had contacted, to represent plaintiffs in the settlement. Dionido was provided with the settlement documents upon arrival. He then met privately with plaintiffs for several hours to review the documents. Also present at Dionido's morning meeting with plaintiffs was Mr. F.H. Santos of the Philippine Department of Labor, Overseas Workers Welfare Administration ("OWWA"). Dionido explained the meaning of the documents, and explained to plaintiffs that this was a full and final settlement of all claims they had against defendant. Dionido translated portions of the documents into Tagalog for plaintiffs.

During review of the documents, plaintiffs requested a change in one of the documents, the revocation of power of attorney. Plaintiffs requested that a portion of that document calling for plaintiffs' American attorney to forward his account for expenses to plaintiffs be deleted. Plaintiffs advised Dionido that they wanted this portion of the revocation deleted because their American attorney had not done anything for them. Dionido advised Clemo that plaintiffs would not agree to the settlement and sign the settlement documents unless this change was made. Clemo then advised that defendant was amenable to the change.

During his morning meeting with plaintiffs on August 3, 1989, Dionido advised plaintiffs that they could call another attorney if they wished further explanation. Within the context of plaintiffs expressing concern over paying their American attorney, Dionido also advised plaintiffs that if they wished to settle the matter, it would better serve that purpose if they did not contact their American lawyer. (Plaintiffs' Exhibit # 8—transcript). However, neither Dionido nor anyone else at Pandiman sought in any way to prevent or restrict plaintiffs, who were able if they so desired, from contacting Dodson. This was left entirely up to them, individually or collectively.

12. While the change to the revocation of power of attorney requested by plaintiffs was being made, plaintiffs left Pandiman's office and went to lunch with Santos and a member of Pandiman's staff. Throughout the time that plaintiffs were away from Pandiman's office, they made no attempt whatsoever to contact Nolasco, Dodson, or any other attorney concerning the proposed settlement.

13. Plaintiffs returned to Pandiman's office at approximately 2:00 p.m. that afternoon and again met with Dionido, who again reviewed the settlement documents with them. Again plaintiffs acknowledged to Dionido that they fully understood the settlement documents and the settlement, and that they were entering into this settlement freely, voluntarily, and without duress or coercion.

14. At approximately 2:30 p.m., attorney Victorino Fornier arrived at Pandiman to serve as a notary public in connection with the settlement. Fornier, who spent three hours with plaintiffs that afternoon, witnessed Dionido explaining the settlement documents to plaintiffs. Fornier spoke individually with each plaintiff to ensure that each fully understood the settlement documents and the effect of the settlement, and determined that they were entering into settlement freely and voluntarily, without duress of coercion. Each plaintiff advised Fornier that he fully understood the settlement documents and the terms and effects of the settlement, and that he was entering into the settlement freely and voluntarily, without duress or coercion. Fornier then administered separate oaths to each plaintiff, in which plaintiffs again declared that they understood this was a full and final settlement of all claims, fully understood and agreed to the terms of the settlement, and were entering into the settlement freely and voluntarily. (Defendant's Exhibits # 4–7).

15. Plaintiffs, who were in happy spirits (Plaintiffs' Exhibit # 8), were then paid 117,800 Philippine pesos apiece ($5,500). They signed the settlement documents, as did Santos of OWWA and Captain Marmaras as defendant's representative. Fornier notarized the documents. (Defendant's Exhibits # 4–7).

16. As an additional condition of settlement, plaintiffs required that entries in their seaman's books indicating that their discharge from M/V SPILIADA was due to ITF activity be changed. Captain Marmaras agreed to do so, and erased the entry "Due ITF" and wrote over that entry "Mutual Consent" or "Mutual Agreement" in their books.

17. Six days after entering into this settlement, plaintiffs met with Nolasco and attorney John Caskey, an associate of plaintiffs' former American attorney Dodson. At that time, Caskey and/or Nolasco prepared form affidavits for execution by each plaintiff claiming that they had entered into the settlement because of threats of blacklisting and dire financial circumstances.

18. Plaintiffs filed this lawsuit August 27, 1989, three weeks after entering into the settlement. In the complaint, plaintiffs renounced the settlement, claiming they entered into the settlement solely because of force, coercion, and dire financial circumstances.

19. Plaintiffs entered into the settlement on August 3, 1989 freely, voluntarily, and without duress or coercion. The testimony of Dionido, Fornier, Clemo, and Marmaras is credible to the effect that no threats were made to force plaintiffs into settlement. Captain Marmaras did advise plaintiffs that they would never work again on Buenamar managed vessels. However, this was not new information to plaintiffs.

20. Defendant reasonably and fairly negotiated with plaintiffs. The court credits the testimony of Clemo and Marmaras that plaintiffs initial settlement demand was $6,000 and notes that each plaintiff received $5,500, an amount significantly higher than defendant's original offer of $2,000. Plaintiffs contentions that they entered into this settlement only because Spiliada threatened to have them blacklisted is not credible. Plaintiffs produced no evidence of any such threats, other than their own unsubstantiated testimony. Further, plaintiffs actions are inconsistent with claims

that they were forced into the settlement. Plaintiffs admitted that they rejected Spiliada's initial $2,000 settlement offer, and Spiliada's subsequent $4,000 settlement offer. Also, plaintiffs demanded that certain changes be made to the settlement documents and their seaman books. The bargaining ability to demand these changes, and to reject Spiliada's first two offers is inconsistent with their claim that they were forced into settlement.

21. Plaintiffs contention that they were forced into the settlement because of "dire financial circumstances" is likewise unsupported by the facts. Plaintiffs wage records and testimony indicate that they each had between $1,100 and $2,100 when they returned to the Philippines after their discharge, less than three weeks before the settlement. These sums constitute 23,000 to 44,000 Philippine pesos. Plaintiffs testified that their average monthly expenses in Philippines were 3,000 to 4,000 Philippine pesos. Plaintiffs admitted that they did not seek employment between their discharge by defendant and the settlement. These facts contradict the assertion that they were experiencing financial problems.

In addition, plaintiffs were aware that their American lawyer had offered them financial assistance on August 1, 1989, the day before four of the five plaintiffs agreed to the settlement, and two days before they all signed the settlement documents. (Defendant's Exhibit # 1). None of the plaintiffs requested such assistance. The court credits the testimony of Dionido, Fornier, Clemo and Marmaras that none of the plaintiffs made reference to financial hardship or appeared financially distressed during the settlement negotiations. (*See also* Plaintiffs' Exhibit # 8).

22. The court rejects plaintiffs' claim that they were denied access to legal counsel. Four of the plaintiffs met with Nolasco and reviewed correspondence from Dodson on August 1, 1989, the day before four of the plaintiffs agreed to the settlement, and two days before all plaintiffs signed the settlement documents. During this meeting with Nolasco, they discussed the probable length of the proposed U.S. litiga-

tion. Nolasco acknowledged at his deposition that he told plaintiffs that the ultimate decision to press forward with the litigation or settle the matter was theirs. When four of the plaintiffs arrived at Pandiman on August 2, 1989, they told Clemo they were being advised by Nolasco. Plaintiffs told him they had an American lawyer, but they did not remember his name. Since plaintiffs had just reviewed Dodson's letter the day before, and given their request that the revocation of power of attorney towards Dodson be changed, the court concludes that plaintiffs' failure to advise of Dodson's representation was intentional.

Plaintiff Castillo spoke with Nolasco from Pandiman via phone on August 2, 1989 and again on August 3, 1989. Plaintiffs contention that they were denied access to use of telephones while at Pandiman is contrary to the credible evidence. While it is true that Dionido advised plaintiffs that it did not serve their purpose to contact Dodson if their intent was to settle the matter, plaintiffs had every opportunity to telephone him or any other attorney after leaving Pandiman on August 2, 1989, before arriving there on August 3, 1989, or when they went out to lunch on that date.

23. Plaintiffs fully understood the finality of the settlement that they entered, and specifically understood that it terminated *all* claims arising out of their employment dispute with defendant. Plaintiffs thus were aware that the settlement would bar them from filing a lawsuit in the U.S. based on these same claims. If plaintiffs lacked a full explanation of their rights under U.S. law prior to entering settlement, it was solely through their own conscious decision to settle all their claims without inquiring about the nature of their claims under U.S. law.

24. Plaintiffs received adequate consideration for this settlement. All of plaintiffs claims are disputed, including their claims for wages, penalty wages, and damages for breach of contract, wrongful discharge, and retaliatory discharge. Assuming that the contracts forwarded to defendant when plaintiffs boarded M/V SPILIADA apply, defendant did not owe plaintiffs

any wages since they were paid pursuant to those contract rates when they were discharged. Assuming that the POEA approved contracts apply, plaintiffs were paid more in the settlement than they were owed. Plaintiffs contentions that the "Due ITF" term is still visible in their seaman books and prevents them from further maritime employment is not persuasive.

## CONCLUSIONS OF LAW

1. The present issue is whether this court has subject matter jurisdiction to resolve this lawsuit. The party asserting subject matter jurisdiction has the burden of proving that the basis for jurisdiction exists. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135, 1141 (1936); *Diefenthal v. Civil Aeronautics Board*, 681 F.2d 1039, 1052 (5th Cir.1982), *cert. denied*, 459 U.S. 1107, 103 S.Ct. 732, 74 L.Ed.2d 956 (1983). Accordingly, plaintiffs have the burden of proving that this court has subject matter jurisdiction.

■ 2. Plaintiffs claim this court has mandatory subject matter jurisdiction because this case involves claims for penalty wages under the U.S. Penalty Wage Statute, 46 U.S.C. 10313.[7] However, jurisdiction over this matter is mandatory only if plaintiffs' wage claims are brought in good faith. *Abraham*, 681 F.2d at 453. Due to the potential for abuse in a rule requiring a court to assume jurisdiction over a seaman's suit whenever a wage claim is made, regardless of other considerations, the plaintiff must come forward with evidence of good faith when contacts with the U.S. are minimal, and the defendant denies liability for the wage claim. *Id., citing Dorizos v. Lemos and Pateras, Ltd.*, 437 F.Supp. 120, 123 (S.D.Ala.1977); G. Gilmore & Black at 479.

3. In *Morewitz v. Andros Compania Maritima, S.A.*, 614 F.2d 379, 382, n. 4 (4th Cir.1980), the Fourth Circuit described the standard for determining whether a wage claim was brought in good faith:

'A claim may be asserted in good faith even though it ultimately may be found to be unmeritorious.' [citation omitted]. Nevertheless, in these circumstances, prognostication as to probable success or lack of success of the action is a surer technique for assessing good faith than any other. Concentration on prospects of success is reasonable where jurisdiction of another claim will exist only on a pendent basis. To keep the tail from wagging the dog, it is sound judicially to make sure the claim upon which jurisdiction depends is not entirely devoid of any prospect of success.

■ 4. The critical inquiry is whether plaintiffs acted in good faith when they entered into a settlement, immediately renounced it, and then filed this lawsuit. In *Morewitz*, the court held that a release of a deceased seaman's wage claims by his heirs, who had no knowledge independent of that obtained from the seaman's employer as to the exact amount of wages due, pretermitted a finding that a wage claim had been asserted in good faith where circumstances surrounding the release involved no fraud, duress, or unseemly conduct. *Id.* at 382. Similarly to *Morewitz*, the settlement of these wage claims and other claims by plaintiffs prior to the filing of this lawsuit undermines plaintiffs' argument that their wage claims are brought in good faith.

5. In determining the validity of a seaman's release, a U.S. court must determine whether the seaman fully understood his rights and the consequences of the release, and whether the release was executed without deception or coercion. *Durden v. Exxon Corp.*, 803 F.2d 845, 847 (5th Cir.1986). The settlement agreement plaintiffs entered on August 3, 1989 were negotiated at arms length. Plaintiffs freely and volun-

---

7. Plaintiffs also assert various other claims for damages for wrongful discharge, and breach of contract under the general maritime law. These other claims are derivative of their wage claims. If mandatory jurisdiction is established in federal district court pursuant to 46 U.S.C. 10313, courts generally maintain jurisdiction over the entire matter. *Dutta v. Clan Grahan*, 528 F.2d 1258, 1260 (4th Cir.1975); G. Gilmore & Black, *The Law of Admiralty*, 479–80 (2d ed. 1979).

tarily relinquished all claims they had for wages, penalty wages, and damages at that time.[8]

6. Plaintiffs contention that they received no detailed explanation of their rights under U.S. law, the law of Greece, or the law of Liberia is legally insufficient to invalidate the settlement. As stated in *Garrett:*

> The adequacy of the consideration and the nature of the medical and legal advice *available* to the seaman at the time of signing the release are relevant to an appraisal of this understanding.

317 U.S. at 248, 63 S.Ct. at 252, 87 L.Ed. at 245 (emphasis added). As stated earlier, plaintiffs had ample opportunity to contact their American attorney for a full explanation of their rights under U.S. law, but plaintiffs chose not to do so. Thus, plaintiffs had sufficient legal advice *available* to them at the time of settlement. To invalidate this settlement because plaintiffs chose not to contact their American lawyer would unduly penalize defendant for plaintiffs' conscious decision to disregard the availability of their American lawyer.

7. A seaman need not be represented by an attorney at the time of settlement, and the absence of an attorney does not require abrogation of a settlement agreement. In *Durden,* 803 F.2d at 845, the court upheld a seaman's release of his Jones Act and general maritime law injury claims where the plaintiff had settled without the benefit of legal counsel, holding that:

> During the settlement discussions, [defendant's attorney] told [plaintiff] that [he] was entitled to retain his own attorney. [Plaintiff] understood that he was settling this claims against [defendant] ... but retaining his rights against [another party]. Given the risks of litigation, the amount of settlement is not clearly inadequate. The plaintiff must live with his bargain.

A similar result was reached in *Thomas v. Humble Oil & Refining Co.,* 292 F.Supp. 260 (E.D.Va.1968), *aff'd,* 420 F.2d 793 (4th Cir.1970), where a release executed by an unrepresented seaman was again upheld as valid. The court in *Thomas* noted:

> While the plaintiff had only a third-grade education and is limited as to his ability to read and write, he successfully passed an oral examination given by the [U.S.] Coast Guard to become an oiler. On occasions when he executed the release forms, he read them aloud and filled in certain blanks on at least seven different occasions ... There was abundant evidence to the effect that the document was fully explained to him, as was the nature of the transaction, and on each occasion plaintiff stated that he understood same.

*Id.* at 266–67.

Plaintiffs in this matter not only knew they were entitled to an attorney, but had already spoken with several attorneys. The settlement documents were thoroughly explained to them by Dionido, and plaintiffs acknowledged to Dionido and notary public Fornier that they understood the documents and the effect of the settlement. Under *Durden* and *Thomas,* the settlements are therefore valid as a matter of U.S. law.

8. The adequacy of the consideration for a seaman's release, while relevant, is not the court's primary concern in addressing the validity of such a release. *Bass v. Phoenix Sea Drill/78, Ltd.,* 749 F.2d 1154, 1162 (5th Cir.1985). Nevertheless, the consideration for the settlement of $5,500 for each plaintiff was sufficient to demonstrate plaintiffs' understanding of their rights and the consequences of the settlement, especially in light of their initial demand of $6,000, their rejection of defendant's offers of $2,000 and $4,000, and their concern

---

**8.** Plaintiffs contend that the court improperly imposed on them the burden of setting aside the releases, contending that a shipowner who asserts a defense based on a seaman's release has the burden of upholding that release pursuant to *Garrett v. Moore–McCormack Co.,* 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942). The

court disagrees and believes *Garrett* is distinguishable since jurisdiction in that case was not at issue, but holds that the August 3, 1989 releases were clearly valid, and the outcome in this dispute would be the same regardless of which party had the burden of proof on this issue.

regarding how long litigation in the U.S. would last.

9. Therefore, the court concludes as a matter of law that plaintiffs did not act in good faith when they renounced the settlement and filed this lawsuit. Thus, the court lacks subject matter jurisdiction over this matter pursuant to *Abraham, supra.*

Accordingly, Spiliada's Motion for Summary Judgment is GRANTED. Plaintiffs' Motion for Summary Judgment is DENIED. Counsel for Spiliada is directed to submit a judgment for the court's consideration consistent with this minute entry.